# Illinois Official Reports

## Appellate Court

---

### *People v. Smith*, 2015 IL App (1st) 140494

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN SMITH, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-14-0494 |
| Filed | November 10, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 01-CR-23940; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jennifer L. Bontrager, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Carol L. Gaines, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Fitzgerald Smith and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Kevin Smith, convicted of first degree murder for the shooting death of Ardeen Adams,[1] appeals the second stage dismissal of his postconviction petition. On appeal, Smith contends that he made a substantial showing of actual innocence where an eyewitness to the shooting recanted his identification of Smith. For the reasons that follow, we reverse the judgment of the trial court and remand for an evidentiary hearing.

¶ 2                             BACKGROUND

¶ 3     On August 27, 2001, a group of Gangster Disciples were shooting dice at the corner of South Evans Avenue and South Lyon Avenue in Chicago at approximately 10 p.m., when a white car approached. The three men inside the car began shooting at the dice players, killing Ardeen Adams and wounding Anton Moore. Defendant Kevin Smith and codefendant Kenneth Calhoun, who eyewitnesses identified as two of the shooters, were charged with multiple counts of first degree murder, attempted first degree murder, and aggravated battery with a firearm.

¶ 4     At a joint but severed bench trial beginning on December 5, 2003, the court heard testimony from three eyewitnesses, beginning with Robert Evans, a former Gangster Disciple who was playing dice that evening. At some point during the game, Evans noticed a white car arriving on the scene, slowing as it reached the group of men. Although he could not identify the driver, Evans recognized Smith in the front passenger seat and Calhoun in the rear seat. He and Smith had been friends for 12 years despite their membership in rival gangs that were at war. (Smith was a Mickey Cobra.) Although it was nighttime, Evans testified that the area was well-lit by a streetlight. When the car was about 12 feet away, Smith pulled himself out of the passenger side window and began shooting. Smith fired the first shot directly at Evans. The group of dice players immediately scattered. Evans could not locate Adams, but did see that Moore was shot twice in the back. He later identified Smith in a line-up and signed a statement on August 28, 2001 identifying Smith as one of the shooters.

¶ 5     William Robinson, another man among the group of dice players, also observed a white car with three men inside approach the game and begin shooting but testified that it was too dark to identify the shooters. Robinson denied telling Chicago police detectives and an assistant State's Attorney that Smith was one of the shooters and denied viewing a line-up in which he identified Smith. Robinson admitted signing a statement which indicated that he recognized Smith as the shooter but testified that he signed that statement without reading it so that he could leave police custody after having been detained and handcuffed for several hours.

¶ 6     The third eyewitness to testify was Bridget Banks, Adams' girlfriend. Banks walked to the dice game to ask Adams to come home, and, as she was walking back to her house after their conversation, she saw a white car drive by and heard gunshots. Banks "thought" she saw Smith, whom she had known since grammar school, in the passenger seat of the car, but she was not sure. Banks told detectives as much when they interviewed her following the shooting. Banks admitted that she viewed a line-up that included Smith on September 3, 2001, and that she identified him as the man in the front passenger seat but denied that she told detectives he

---

[1]Adams' first name is spelled both "Ardean" and "Ardeen" in the record. We use the latter spelling, as that is how this court referred to him on direct appeal.

was firing a handgun. When asked about the statement she signed before the assistant State's Attorney indicating that she saw Smith firing a gun, she denied reading the entirety of the statement prior to signing. Banks was impeached with her grand jury testimony where she testified that she had read her signed statement and that it was an accurate account. She further testified before the grand jury that she saw Smith in the car firing a gun. As an explanation for her change in testimony, Banks testified that she initially implicated Smith because he had gotten "into it" with Adams "a lot" and she wanted revenge.

¶ 7    The detectives and assistant State's Attorney who interviewed Robinson and Banks testified about the circumstances surrounding their statements and line-up identifications, confirming that both Robinson and Banks had positively identified Smith as one of the shooters. The assistant State's Attorney further testified that Robinson had not been handcuffed when he was giving his statement.

¶ 8    Police did not recover a gun from Smith, and the bullets recovered from the crime scene matched a gun found in the possession of another man, Earl Dunne, who was not charged in connection with Adams' murder.

¶ 9    The parties stipulated that Evans had not told officers on the scene immediately following the shooting that he recognized Smith as the shooter. The parties also stipulated that if called to testify, Smith's girlfriend, Lovie Brown, would testify consistently with her grand jury testimony. Before the grand jury, Brown testified that when she left her house to go to work at approximately 2 p.m. on August 27, 2001, Smith was there watching television. When she arrived home at 11:30 p.m., Smith was still there, and her sister, Erica Brown, was asleep in the next room. Smith did not have a key to her house.

¶ 10    The trial court found Smith guilty of murder and attempted murder and sentenced him to 40 years' imprisonment.

¶ 11    On direct appeal, Smith argued the trial court committed reversible error in denying his second motion for a continuance in order to produce Erica Brown as an alibi witness; this court affirmed Smith's conviction. *People v. Smith*, No. 1-06-0043 (2009) (unpublished order under Supreme Court Rule 23).

¶ 12    Smith timely filed the instant postconviction petition *pro se* on March 12, 2010, arguing that he was denied effective assistance of trial and appellate counsel and that his due process rights were violated. He attached affidavits from Robinson and Banks, both of whom repeated their trial testimony that Smith was not the shooter. The trial court appointed counsel to represent Smith, and in October 2012, counsel supplemented Smith's postconviction petition with a claim of actual innocence and attached a third affidavit, this one from Evans. Evans averred that following his testimony at Smith's trial, he began to have doubts about his identification. His doubts arose following a conversation with Banks, who told him that she was "sure" Smith was not the shooter. He then spoke to an unnamed acquaintance who informed him that one of the shooters was a "dude" named "Spanky." One month following trial, Evans was in a car when someone pointed out Spanky. Immediately upon seeing the individual identified as Spanky, it "came to [Evans]" that Spanky, who looked a bit like Smith, was the actual shooter. According to Evans, his mistaken identification plagued him for some time, but he did not know whom to inform of his error until the summer of 2012, when he met his friend "Reggie" after nearly 10 years. Reggie, also a friend of Smith's, told Evans that Smith wanted to contact him. Evans gave Reggie his phone number and told Reggie that he

wanted to help Smith, because he "knew it wasn't [Smith]." Smith called Evans and arranged for Evans to meet his attorney. Evans later prepared the affidavit recanting his identification.

¶ 13 On May 22, 2013, the State filed a motion to dismiss Smith's postconviction petition on the basis that Smith's claim of actual innocence based on Evans's recantation was unlikely to change the result on retrial. After hearing argument, the trial court granted the State's motion on January 28, 2014. Smith timely filed this appeal.

¶ 14 ANALYSIS

¶ 15 The Post-Conviction Hearing Act (Act) allows a defendant who is imprisoned in a penitentiary to challenge his conviction or sentence for violations of his federal or state constitutional rights. 725 ILCS 5/122-1 (West 2014); see also *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). A defendant electing to proceed under the Act must first file a petition, verified by affidavit, in the circuit court in which the original proceeding occurred. 725 ILCS 5/122-1(b) (West 2014). Because a postconviction proceeding is a collateral attack on the conviction, the petition must be limited to constitutional issues that have not been, nor could have been, adjudicated on direct appeal. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002).

¶ 16 The Act establishes a three-stage process for adjudicating a postconviction petition. 725 ILCS 5/122-1 (West 2014). At the first stage, the trial court may dismiss a petition only if it is frivolous or patently without merit. *People v. Harris*, 224 Ill. 2d 115, 125-26 (2007). If the petition survives dismissal at this initial stage, it advances to the second stage, where counsel may be appointed to an indigent defendant and the State may move to dismiss the petition. *Id.* at 126. The defendant must then make a substantial showing of a constitutional violation in order to proceed to an evidentiary hearing, which is the third and final stage of the postconviction process. *Id.* (citing 725 ILCS 5/122-6 (West 2002)).

¶ 17 In this case, only the second stage is at issue. The trial court may dismiss a petition at this stage if, after reviewing the allegations in the petition and liberally construing the trial record, it finds that the defendant has failed to make a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). The court does not engage in fact-finding or credibility determinations at the second stage, but takes all well-pleaded facts not positively rebutted by the record as true. *Id.* at 385. Our review of the trial court's second-stage dismissal is *de novo*. *People v. Childress*, 191 Ill. 2d 168, 174 (2000).

¶ 18 Smith's sole argument on appeal is that he made a substantial showing of his actual innocence so as to entitle him to an evidentiary hearing on his claim. The conviction of an innocent person violates the Illinois Constitution's guarantee of due process and is thus a cognizable constitutional violation under the Act. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). But in order to proceed to an evidentiary hearing on a free-standing claim of actual innocence, a petitioner must present newly discovered evidence that vindicates or exonerates him. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). The new evidence must do more than merely call into question the sufficiency of the evidence adduced at trial. *People v. Coleman*, 2013 IL 113307, ¶ 97. Instead, the evidence must also be material, noncumulative, and "of such conclusive character that it would probably change the result on retrial." (Internal quotation marks omitted.) *Ortiz*, 235 Ill. 2d at 333. Our supreme court recently defined these terms as follows:

"New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the

- 4 -

evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *Coleman*, 2013 IL 113307, ¶ 96. We consider each element in turn.

¶ 19 First, the record supports the conclusion that Evans' recantation qualifies as newly discovered evidence. It is plain that Smith could not have discovered Evans' recantation prior to trial, as Evans himself believed that he accurately identified Smith as the shooter at the time he testified. The State nevertheless finds fault with Smith's failure to show that he could not have learned of Evans' doubts about his identification "prior to the middle of 2012." But the law does not require Smith to make this showing: he need only demonstrate that his failure to discover the evidence *prior to trial* was not due to a lack of diligence. See *People v. Molstad*, 101 Ill. 2d 128, 134 (1984) (" 'new evidence *** must have been discovered since the trial and be of such character that it could not have been discovered *prior to trial* by the exercise of due diligence' " (emphasis added) (quoting *People v. Baker*, 16 Ill. 2d 364, 374 (1959))); see also *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 28 (where defendant did not show that he could not have discovered witness "*prior to the *** trial*," evidence not newly discovered (emphasis added)). And no amount of due diligence would have allowed Smith to secure Evans' recantation of his identification prior to trial where Evans averred that he believed in the identification's accuracy at that time.

¶ 20 With regard to the second and third elements, the State does not argue that Evans' affidavit is immaterial or cumulative, and it is clear that it is not. Evans' assertion that "Spanky" and not Smith was the shooter is certainly relevant and supports Smith's innocence. Moreover, given the absence of any evidence at trial pointing to Spanky as a suspect, Evans's affidavit is likewise not cumulative. See *People v. Lofton*, 2011 IL App (1st) 100118, ¶ 38 (evidence that someone else was shooter was material and noncumulative).

¶ 21 We turn finally to the question of whether Smith made a substantial showing that Evans' recantation was of such conclusive character that it would have probably led to a different result. See *Washington*, 171 Ill. 2d at 489 ("conclusive character" element is most important for claim of actual innocence). The State initially reminds us that recantations are inherently unreliable (see, *e.g.*, *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)) and goes on to point out specific problems with Evans' reliability, such as his failure to recall the name of the individual who told him that Spanky was the shooter, and his failure to provide a first and last name for "Spanky." But any argument regarding the reliability of the evidence is premature given that the Act expressly prohibits credibility determinations at this stage of proceedings. *Coleman*, 183 Ill. 2d at 390-91. Instead, we must take the contents of Evans' affidavit as true (insofar as it is not positively rebutted by the record) and leave it for the trial court to consider the veracity of Evans' averments at any later evidentiary hearing. *Id.*

¶ 22 Taking Evans' statements as true, we agree with Smith that he has made a substantial showing that the recantation would probably result in a different outcome. Evans was the only eyewitness to identify Smith as the shooter at trial; the other two eyewitnesses–Robinson and Banks–both recanted their prior identifications in their trial testimony. Furthermore, the State produced no physical evidence linking Smith to the crime. The police never recovered a gun from Smith and the bullets police recovered from the crime scene matched a gun in the possession of a different individual. Because Evans' testimony was the strongest evidence

against Smith, its recantation has the capacity, if believed, to produce a different result. See *People v. Burrows*, 172 Ill. 2d 169, 181 (1996) (where critical witness implicating defendant recanted trial testimony and no physical evidence linked defendant to crime, defendant entitled to new trial).

¶ 23 We disagree with the State's characterization of Evans' recantation as mere impeachment. In his affidavit, Evans does not deny his earlier identification of Smith but exonerates him altogether and names a different perpetrator. As such, his testimony could lead to a different result at a new trial. See *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 ("[W]here newly discovered evidence is both exonerating and contradicts the State's evidence at trial, it is capable of producing a different outcome at trial."); *cf. People v. Collier*, 387 Ill. App. 3d 630, 637 (2008) (where witnesses' "changing stories" were explored at trial, further recantation testimony unlikely to change result on retrial). This is true notwithstanding the fact that Evans' prior inconsistent testimony would likely be admissible as substantive evidence on retrial. See *People v. Alexander*, 2014 IL App (2d) 120810, ¶ 34 (finding that witness's recantation of trial testimony likely to change result even where State could use trial testimony as substantive evidence at new trial).

¶ 24 Finally, we reject the State's argument that Evans' failure to aver that he would testify to the facts in his affidavit diminishes the conclusive character of his recantation. To be sure, the Act requires a petitioner to support his claims of constitutional violations with affidavits that "identif[y] with reasonable certainty the source, character, and *availability* of the alleged evidence." (Emphasis added.) *People v. Johnson*, 183 Ill. 2d 176, 190 (1998). Here, while Evans did not expressly state that he would testify at an ensuing trial, he indicated his availability in other ways, stating, for example, that he "wanted to try to help [Smith]," and, indeed, taking steps to do so by communicating with Smith's attorney.

¶ 25 Notably, Evans does not inculpate himself in the shooting or admit to perjury; therefore, Evans faces no criminal consequences for testifying. For this reason, Evans' affidavit is not akin to those this court found insufficient in *People v. Jones*, 399 Ill. App. 3d 341 (2010), and *People v. Brown*, 371 Ill. App. 3d 972 (2007), where the affiant incriminated himself in the crime (*id.* at 982) or admitted lying to officers (*Jones*, 399 Ill. App. 3d at 354). Under those circumstances, this court required an affirmative statement that the affiants would testify to the facts contained in their affidavits before deeming the affiants "available." *Brown*, 371 Ill. App. 3d at 982; *Jones*, 399 Ill. App. 3d at 366-67. Here, because Evans did not admit to wrongdoing, there is no reason to suspect that he may not testify in accordance with his affidavit at a retrial.

¶ 26                                         CONCLUSION

¶ 27 For the reasons stated, we reverse the trial court's dismissal of the petition and remand for a third stage evidentiary hearing.

¶ 28 Reversed and remanded.