# Illinois Official Reports

## Appellate Court

---

### *People v. Calhoun*, 2016 IL App (1st) 141021

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH CALHOUN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-1021 |
| Filed<br>Rehearing denied | December 13, 2016<br>January 2, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 01-CR-25785; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Sarah Curry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Presiding Justice Hyman dissented, with opinion. |

**OPINION**

¶ 1    Following a 2005 bench trial, defendant Kenneth Calhoun was convicted of the first degree murder of Ardeen Adams and sentenced to an aggregate term of 40 years' imprisonment. Calhoun appeals from the circuit court's order denying him leave to file a second successive *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). He contends that his petition presented a colorable claim of actual innocence based on the attached affidavits of Robert Evans, Bridget Banks, and William Robinson, the State's eyewitnesses, recanting their trial testimony. We affirm.

¶ 2    On August 27, 2001, members of the Gangster Disciples street gang were playing a dice game near 9337 South Evans Avenue in Chicago. At about 10 p.m., a white car approached the group, and three men inside the car began shooting at the dice players. As a result of the shooting, Adams was killed, and Anton Moore and Matthew Shorts were wounded. Calhoun and codefendant Kevin Smith, who Evans, Banks, and Robinson identified as two of the shooters, were charged by indictment with multiple counts of first degree murder, attempted first degree murder, and aggravated battery with a firearm.

¶ 3    At a joint but severed bench trial, Evans, Banks, and Robinson provided similar eyewitness accounts of the shooting. Evans, a former Gangster Disciple, testified that, during the evening of August 27, he was playing dice with a group of friends, including the victims Adams, Moore, and Shorts, under a street lamp near the intersection of South Evans Avenue and South Lyons Avenue. At about 10 p.m., a white car approached the group and slowed down. Evans, who was about 12 feet from the passenger side of the car, could not identify the driver of the car but recognized Calhoun in the rear seat and codefendant Smith in the front passenger seat. Prior to the shooting, Evans had been friends with Calhoun for about 9 or 10 years and Smith for at least 12 years, despite their membership in rival gangs that were "at war" (Calhoun and Smith were members of the Mickey Cobras street gang). Evans testified that Calhoun started shooting from the back seat of the car, while Smith shot from the front passenger seat. The driver was also shooting from the driver's seat. Evans ran in front of the car and heard 30 to 40 shots. Evans could not locate Adams after the shooting but saw that Moore was shot twice in the back.

¶ 4    Shortly after the shooting, Evans spoke with Chicago police Detectives David Fidyk and Scott Rotkovich about the shooting and told them that Calhoun and Smith were the shooters. Evans later identified Calhoun and Smith from separate lineups at the police station. Evans also identified Calhoun and Smith in open court.

¶ 5    Banks testified that on August 27, 2001, she walked from her house to the group playing dice to ask Adams, her boyfriend at the time, to come home. Adams refused, and Banks began to walk back to her house, located about two blocks away. As Banks walked to her house, she saw a white car approach the group and heard gunshots. During her testimony, Banks testified that she "thought" she saw Smith in the front passenger seat of the car, but that she was not sure. Banks denied seeing Calhoun in the car. Banks admitted telling detectives that she thought she saw Smith in the car. She also admitted identifying Smith from a photo array and lineup. Banks's version of the shooting was reduced to writing by Assistant State's Attorney (ASA) Jim Lynch. Banks admitted reading and signing the statement.

¶ 6    When the State confronted Banks with her statement at trial, she denied that she had identified Calhoun as one of the shooters. Banks testified that she, Robinson, and Evans had

smoked marijuana before speaking to police. Banks was impeached with her grand jury testimony, in which she had identified Calhoun as one of the shooters. She then admitted that she had identified Calhoun from a lineup and that she told a detective that Calhoun was in the back seat but that he was not shooting.

¶ 7 On cross-examination, Banks stated that she had known all along that Calhoun and Smith were not the shooters but that she had told police that they were in order to seek revenge against them for a gang dispute. Banks also stated that the lighting conditions at the time of the shooting prevented her from seeing who was inside the car. Banks testified that she saw Evans purchase crack cocaine and marijuana from Adams about 30 minutes before the shooting. Banks also testified that, although she had lied in front of the grand jury, she was telling the truth at trial.

¶ 8 Robinson testified that he was familiar with Calhoun and Smith because they all attended the same school. On the night of the shootings, Robinson was among the group of dice players and saw a white car with three men inside approach. The people inside the car began shooting. Robinson testified that it was too dark to identify the shooters. Robinson admitted that he spoke with detectives at the police station. He stated that he told the detectives that he did not recognize any of the men in the white car. Robinson denied telling police that Calhoun and Smith were the shooters. He also denied viewing a lineup at the police station.

¶ 9 The State confronted Robinson with a statement he made to police that had been reduced to writing in which he indicated that he saw Calhoun in the back seat of the car holding a gun. Robinson admitted that he had signed the statement but testified that he did so only because he had been handcuffed to a rail and was told that he could leave the police station if he signed the statement.

¶ 10 Detectives Fidyk and Rotkovich and ASA Lynch, who interviewed Banks and Robinson, testified about the circumstances surrounding their statements and lineup identifications of Calhoun and Smith. The testimony of the detectives and ASA Lynch confirmed that both Banks and Robinson had positively identified Calhoun and Smith as two of the shooters. The detectives and ASA Lynch also testified that Robinson was not handcuffed or threatened that he would be locked up if he did not provide a statement.

¶ 11 Calhoun and Smith then presented evidence in their defense, each adopting the evidence presented by the other. The parties stipulated to the grand jury testimony of Lovie Brown, Smith's girlfriend, which was read into the record. Brown testified before the grand jury that Smith had been residing with her and her sister Erica for a week and a half while he looked for a job. On August 27, 2001, Brown was scheduled to work from 3 p.m. to 11 p.m., and she left the house at about 2:15 p.m. When she left, Smith was watching television at the house. When Brown arrived home from work at about 11:30 p.m., Smith was lying in the living room watching television. Brown's sister was also home and asleep in bed. When asked if she knew where Smith was at about 10 p.m., Brown stated that she "supposed" he was at her house.

¶ 12 Helen Banks, Bridget Banks's mother, testified that on August 27, she was at her home, which was located 30 to 40 feet from the scene of the shooting. At about 8 p.m., Helen was on her front porch, looking in the direction of Adams and trying to get his attention so he could go to the store for her. She saw a beige four-door car approach the area and heard gunshots. She stated that there were three light-complected men in the car and that Calhoun was not one of them. Helen testified that she had known Calhoun for "quite a while" because he had grown up in the neighborhood. She also testified that at 8 p.m., it was still light outside so she was able to

see well enough to know that Calhoun was not one of the passengers inside the car. Helen testified that she did not speak to police on the night of the shooting because she did not want to be involved. She stated that she decided to come forward because she did not want to see someone go to jail for something he did not do.

¶ 13 On cross-examination, Helen testified that when people in the neighborhood started saying that Calhoun and Smith were the shooters, she started to speak up and told her friends and coworkers that Calhoun and Smith were not the shooters. She acknowledged that she did not tell the police. Helen testified that she told the detectives who came to her house to pick up her daughter Bridget that Calhoun was not involved in the shooting. Helen stated that the detectives did not appear to want to talk to her.

¶ 14 The parties stipulated that bullets recovered from the crime scene matched a gun found in the possession of Earl Dunne, who was not charged in connection with Adams's murder.

¶ 15 The court found Calhoun and Smith guilty of the first degree murder of Adams and the attempted murder of Moore. In announcing its decision, the court stated that it found the eyewitness accounts and statements given to police investigators by Evans, Banks, and Robinson credible. The court pointed out that the three eyewitnesses were familiar with Calhoun and Smith and, after the shooting, gave statements identifying them as occupants of the white car. The court also pointed out that all three eyewitnesses initially identified Calhoun and Smith as the shooters from a lineup. The court found that Banks's and Robinson's recantations at trial were "not at all credible" and that Helen Banks's testimony was also not credible because she was the only witness to testify that the shooting took place at about 8 p.m., when it was still daylight.

¶ 16 The court later sentenced Calhoun to 20 years' imprisonment on the murder conviction, plus an additional 20 years for personally discharging a firearm, for an aggregate term of 40 years' imprisonment on the first degree murder count. Calhoun appealed, contending that (1) the trial court violated his right to due process because his trial was heard on a piecemeal basis over a span of 16 months, (2) the trial court abused its discretion in not granting Smith a second continuance to obtain another alibi witness, which also prejudiced Calhoun's defense, and (3) he was denied his sixth amendment right to effective assistance of counsel based on counsel's failure to object to the fact that the State briefly put on one "nonessential" witness shortly before the 120-day statutory speedy trial deadline but then did not present additional witnesses for another month. This court affirmed Calhoun's conviction and sentence. *People v. Calhoun*, No. 1-07-0007 (2008) (unpublished order under Supreme Court Rule 23).

¶ 17 On April 21, 2011, Calhoun filed a *pro se* postconviction petition, arguing that the first degree murder statute and Public Act 84-1450 were unconstitutional and violated the prohibition against *ex post facto* laws (U.S. Const., art. I, § 9), thus rendering his conviction and sentence void. He also argued that prosecutors fabricated his indictment and arraignment by misleading the grand jury. The circuit court summarily dismissed the petition, finding the issues raised therein frivolous and patently without merit. Calhoun appealed, and this court affirmed the circuit court's order after granting appellate counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Calhoun*, No. 1-11-1786 (2012) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 18 On July 17, 2012, while his appeal from the summary dismissal of his initial postconviction petition was pending, Calhoun sought leave to file a *pro se* successive postconviction petition. In his successive petition, Calhoun argued that his trial counsel was

ineffective for failing to investigate allegations of police coercion. Calhoun also purported to raise a claim of actual innocence based on newly discovered evidence. In support of his actual innocence claim, Calhoun attached the affidavits of Banks and Robinson, recanting their identifications of him as one of the shooters. In her affidavit, dated December 1, 2010, Banks stated that Calhoun was innocent of Adams's murder and that, on the date of the murder, "there was [*sic*] a lot of people out there shooting." Banks averred that she knew Calhoun and Smith were not the shooters and that the Gangster Disciples street gang wanted Calhoun and Smith "out of the way." She also averred that detectives told her that she would be locked up if she did not identify Calhoun as the shooter. The detectives also asked her if she needed anything in exchange for her testimony to which she said "no." Banks further stated that Evans accepted money and cigarettes from the detectives in exchange for his testimony.

¶ 19    In his affidavit, dated July 11, 2011, Robinson averred that Calhoun and Smith were not the shooters and that they were not at the scene of the shooting. Robinson stated that "they lied on [Calhoun and Smith]" because "they knew they didn't like each other." Robinson also averred that Evans told him that the detectives were paying him.

¶ 20    The court denied Calhoun leave to file his successive petition, finding that he did not set forth a freestanding claim of actual innocence and that he failed to satisfy the cause and prejudice test. Calhoun appealed, and this court affirmed the circuit court's order after granting appellate counsel's motion to withdraw pursuant to *Finley*. *People v. Calhoun*, No. 1-12-3578 (2014) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 21    On December 17, 2013, Calhoun sought leave to file the second *pro se* successive postconviction petition that is the subject of this appeal. In his second successive petition, Calhoun alleged that he was actually innocent of Adams's murder. In support of his actual innocence claim, Calhoun attached the same affidavits from Banks and Robinson that he attached to his *pro se* successive postconviction petition. Calhoun also attached an affidavit from Evans, recanting his identification of Smith. Evans's affidavit was obtained by Smith's postconviction counsel. Calhoun's motion for leave to file his successive petition represented that he had obtained Evans's affidavit in July 2013 "through outside help." The motion did not recite that Calhoun had done anything to attempt to investigate the statements in Banks's or Robinson's affidavits from 2010 and 2011 regarding Evans accepting money and other incentives to testify against Calhoun or that he had attempted to contact Evans to obtain further information.

¶ 22    In Evans's affidavit, dated August 1, 2012, Evans averred that following his testimony at trial he began to have "doubts" about his "identifications." His doubt arose following a conversation with Banks, who told him that she was "sure" Smith was not the shooter. Evans then spoke to an unnamed acquaintance who told him that one of the shooters was a person named "Spanky." One month after trial, Evans was in a car and someone pointed out Spanky. Upon seeing Spanky, who looked a bit like Smith, it came to Evans that Spanky was the person he saw shooting from the white car and not Smith. According to Evans's affidavit, his mistaken identification of Smith had been bothering him for some time, but he did not know who to inform of his error until the summer of 2012, when he met his friend Reggie, who was also friends with Smith. Reggie told Evans that Smith wanted to contact him. Evans gave Reggie his phone number and told Reggie that he wanted to help Smith because he knew that Smith was not the shooter. Smith called Evans and arranged for Evans to meet his public defender.

Evans later prepared the affidavit recanting his identification of Smith. Other than its reference to "identifications," Evans's affidavit says nothing about his testimony against Calhoun.

¶ 23    On March 7, 2014, the circuit court entered a written order denying Calhoun leave to file the second successive postconviction petition. The court treated Evans's affidavit as though it recanted Evans's identification of both Smith and Calhoun and found that it was not of such conclusive character that it would probably change the result on retrial, given Evans's extensive identification testimony at trial.

¶ 24    On appeal, Calhoun contends that his petition presented a colorable claim of actual innocence based on the affidavits of Evans, Banks, and Robinson, which were of such conclusive character that they are likely to change the result on retrial. In support of his argument, Calhoun relies on our recent decision in *People v. Smith*, 2015 IL App (1st) 140494. In *Smith*, we reversed the second-stage dismissal of Smith's initial postconviction petition and remanded the matter for an evidentiary hearing after concluding that Smith made a substantial showing that the allegations in Evans's affidavit identifying a third person as the shooter constituted newly discovered evidence that would probably change the result on retrial. *Id.* ¶¶ 19, 21. As we discuss below, the conclusion that Smith was entitled to an evidentiary hearing on his initial postconviction petition bears little, if any, relevance to the trial court's denial of leave to file Calhoun's second successive postconviction petition.

¶ 25    The Act generally contemplates the filing of only one postconviction petition and provides that " '[a]ny claim of substantial denial of constitutional rights not raised in the original or amended petition is waived.' " *People v. Ortiz*, 235 Ill. 2d 319, 328-29 (2009) (quoting 725 ILCS 5/122-3 (West 2006)). This statutory bar to a successive postconviction petition will be relaxed when fundamental fairness requires. *Id.* at 329. Fundamental fairness allows the filing of a successive petition where the petition complies with the cause and prejudice test. *Id.* As our supreme court recognized in *People v. Davis:*

> "[A] defendant faces immense procedural default hurdles when bringing a successive postconviction petition. Because successive petitions impede the finality of criminal litigation, these hurdles are lowered only in very limited circumstances. [*People v.*] *Tenner*, 206 Ill. 2d [381,] 392 [(2003)]. One such basis for relaxing the bar against successive postconviction petitions is where a petition can establish 'cause and prejudice' for the failure to raise the claim earlier. *** 'Cause' refers to some objective factor external to the defense that impeded counsel's efforts to raise the claim in an earlier proceeding. 'Prejudice' refers to a claimed constitutional error that so infected the entire trial that the resulting conviction or sentence violates due process. 725 ILCS 5/122-1(f) (West 2012). [Citations.] Both prongs must be satisfied for the defendant to prevail." *People v. Davis*, 2014 IL 115595, ¶ 14.

In particular, a defendant seeking leave to file a successive postconviction petition must demonstrate cause for failing to raise the claim in his initial postconviction petition. 725 ILCS 5/122-1(f) (West 2012); *People v. Simon*, 2014 IL App (1st) 130567, ¶ 65.

¶ 26    Our supreme court has also recognized a second category of successive postconviction petitions that warrants relaxation of the procedural bar: those raising a fundamental miscarriage of justice. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). A successive postconviction petition that sets forth a claim of actual innocence falls into this latter category and is not subject to the general cause and prejudice test. *Id.*; *Ortiz*, 235 Ill. 2d at 330. Rather, when a successive postconviction petition based upon a claim of actual innocence is filed,

"leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided *** that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *People v. Edwards*, 2012 IL 111711, ¶ 24. Stated differently, "leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

¶ 27    The elements of a successful claim of actual innocence require that the evidence supporting the claim must be (1) newly discovered, (2) material, (3) not merely cumulative, and (4) of such conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32 (citing *Ortiz*, 235 Ill. 2d at 333). In *People v. Coleman*, 2013 IL 113307, ¶ 96, our supreme court clarified that "[n]ew means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" As we recognized in *Smith*, in order to constitute a claim of actual innocence, the new evidence must vindicate or exonerate the petitioner: "[it] must do more than merely call into question the sufficiency of the evidence adduced at trial. *People v. Coleman*, 2013 IL 113307, ¶ 97." *Smith*, 2015 IL App (1st) 140494, ¶ 18.

¶ 28    We first address whether Calhoun's petition sets forth, as he contends, a claim of actual innocence. Because the trial court has already considered and rejected the sufficiency of Banks's and Robinson's affidavits in connection with Calhoun's first successive petition, a ruling we affirmed on appeal, those affidavits cannot possibly be "newly discovered." Further, the recantations in Banks's and Robinson's affidavits mirrored, in large part, their recantations at trial, so they are cumulative. Therefore, we confine our analysis to whether Evans's affidavit supports a claim of actual innocence.

¶ 29    As it relates to Calhoun, Evans's affidavit, at most, raises a claim that shortly after trial, Evans began to doubt his "identifications." Even assuming the plural "identifications" refers to Calhoun as well as Smith, the remainder of the affidavit pertains only to Smith and identifies a third party who Evans claims was the front passenger seat shooter. The affidavit provides no facts regarding Calhoun, nor does it identify anyone else who Evans believes was the rear passenger seat shooter. Evans's affidavit, therefore, cannot support an actual innocence claim by Calhoun. Rather, it raises another sufficiency of the evidence argument, *i.e.*, Calhoun contends that Evans's posttrial "doubts" about his identification of Calhoun undermine Evans's trial testimony in which he positively identified Calhoun as the backseat shooter. Thus, the claim raised by Calhoun in his second successive petition is substantially identical to the one he raised in his earlier petition.

¶ 30    The evidence here is akin to that presented by the defendant in *People v. Collier*, 387 Ill. App. 3d 630 (2008). In *Collier*, the defendant, who was convicted of first degree murder following a drive-by shooting, filed a second successive postconviction petition and attached to it affidavits of three witnesses recanting their trial testimony. *Id.* The first witness averred that he falsely identified the defendant at trial, while the second witness claimed that she fabricated her testimony to match the first witness. *Id.* at 632. The third witness swore that detectives and an ASA manipulated his statement so as to destroy the defendant's alibi

defense. *Id.* at 633. In affirming the circuit court's order denying defendant leave to file the second successive petition, this court held that the winesses' "affidavits measured against their trial testimony address considerations of credibility that go to reasonable doubt, not actual innocence." *Id.* at 637. "However, 'actual innocence' is not within in the rubric of whether defendant has been proved guilty beyond a reasonable doubt. [Citation.] Rather, the hallmark of 'actual innocence' means 'total vindication,' or 'exoneration.' [Citation.]" *Id.* at 636.

¶ 31    Evans's "doubts" about his identification of Calhoun, assuming they exist, do not support a freestanding claim of actual innocence. Consequently, Calhoun was required to satisfy the cause and prejudice test in order to obtain leave to file his second successive postconviction petition. Under the circumstances here, we find that the trial court properly denied leave to file the second successive postconviction petition.

¶ 32    It is unclear whether an abuse of discretion or *de novo* standard of review applies to decisions granting or denying leave to file a successive petition subject to the cause and prejudice test. The language of the statute implies an abuse of discretion standard when it provides that "[l]eave of court [to file a successive petition] *may* be granted" only if the petitioner demonstrates cause and prejudice. (Emphasis added.) 725 ILCS 5/122-1(f) (West 2012). And a trial court's determinations regarding a petitioner's cause for failing to raise a claim earlier and prejudice resulting from the inability to proceed on that claim certainly sound like discretionary rulings. But some courts have concluded that *de novo* review is appropriate because the question under the Act regarding successive petitions concerns the application of a statutory standard. See *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 59 (applying *de novo* standard of review). And our supreme court has not resolved the issue. *Edwards*, 2012 IL 111711, ¶ 30 (declining to decide whether an abuse of discretion or *de novo* standard of review applies to decisions granting or denying leave to file a successive petition raising a claim of actual innocence). However, applying either standard in this case, our conclusion is the same. See, *e.g.*, *Simon*, 2014 IL App (1st) 130567, ¶ 58.

¶ 33    Calhoun cannot satisfy the cause and prejudice test. With respect to cause for failure to raise this claim earlier, by July 17, 2012, when Calhoun filed his first successive postconviction petition, he had both Banks's and Robinson's affidavits, which, in addition to repeating their trial recantations, asserted that Evans had been paid by the police for his testimony against Calhoun. Such information, if true, would put any reasonable person on notice of the possibility (indeed, the likelihood given Banks's and Robinson's recantations of their identification of Calhoun) that Evans's identification testimony was likewise suspect. But neither the first nor the second successive postconviction petition contains any representations regarding efforts Calhoun made to contact Evans, either through Banks or Robinson, with whom he was apparently in touch, or by other means. And if we take Evans's affidavit at face value, shortly after Smith and Calhoun's trial, he was more than willing to rectify his misidentification; he just did not know who to contact. There is thus nothing in the record to explain why Calhoun was unable to raise this issue in his first successive petition or why he needed to rely only on Evans's affidavit filed in Smith's case in support of his second successive petition. See *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002) ("cause" in the context of a successive postconviction petition "refers to any objective factor, external to the defense, which impeded the petitioner's ability to raise a specific claim in the initial postconviction proceeding"). Consequently, Calhoun has not demonstrated cause for his failure to raise this issue earlier.

¶ 34    By the same token, Calhoun cannot establish prejudice due to his inability to present Evans's belatedly tendered affidavit because, at the time the trial court denied leave to file the first successive petition, the court was undoubtedly aware of Banks's and Robinson's assertions regarding Evans being paid for his testimony, yet it denied leave to file, a ruling that we affirmed on appeal. Thus, because the trial court was already aware of information casting doubt on Evans's testimony when it denied leave to file Calhoun's first successive petition, Calhoun cannot establish prejudice, particularly in light of the fact that Evans's affidavit contains such scant reference to his identification of Calhoun.

¶ 35    In short, under any standard of review, the trial court correctly concluded that Calhoun could not overcome the "immense procedural default hurdles" to his second successive petition. *Davis*, 2014 IL 115595, ¶ 14. The dissent's speculation that perhaps Calhoun could have done better if only a lawyer had been appointed to represent him conflates the standards applicable to initial and successive postconviction petitions. We do not here apply the low "frivolous and patently without merit" threshold by which the sufficiency of an initial postconviction petition is evaluated. *Edwards*, 2012 IL 111711, ¶ 29 (rejecting evaluating the sufficiency of initial and successive petitions by the same standard because it "ignores the well-settled rule that successive postconviction petition actions are disfavored by Illinois courts").

¶ 36    It is only by ignoring the significant procedural and substantive distinctions between Smith and Calhoun that the dissent is able to contend that Calhoun is receiving disparate treatment compared to his codefendant. But a different analysis undeniably applies to Smith's initial postconviction petition as opposed to Calhoun's second successive petition and while Evans's affidavit establishes a colorable claim of actual innocence as it pertains to Smith, that same affidavit, under even the most liberal interpretation, raises only another sufficiency of the evidence argument as to Calhoun. Calhoun is not hobbled by his *pro se* status but, rather, by his inability to satisfy the cause and prejudice test, which even the most talented lawyer could not overcome.

¶ 37    For the reasons stated, we affirm the judgment of the circuit court.

¶ 38    Affirmed.

¶ 39    PRESIDING JUSTICE HYMAN, dissenting.

¶ 40    When Calhoun's codefendant, Kevin Smith, used Robert Evans's affidavit to support a claim of actual innocence, this court remanded for an evidentiary hearing on his postconviction petition. See *People v. Smith*, 2015 IL App (1st) 140494, ¶ 1. But the underlying evidence and factual similarities between Smith's and Calhoun's cases show that their different fates on appeal have nothing to do with any difference in culpability between the two men, as I will explain. I respectfully disagree with the majority and would reverse the trial court's judgment and remand for second-stage postconviction proceedings so that counsel may be appointed to represent Calhoun.

¶ 41    The majority states that Evans only recanted his identification of Smith, not of Calhoun. Evans's affidavit states that he and his friends decided that "Kevin and Kenny" (Smith and Calhoun) were two of the shooters but Evans began having doubts about his "identifications" after he testified at trial and did not remember if he ever told a prosecutor that he had doubts about those "identifications." Since Evans made two identifications at trial—one of Smith and

one of Calhoun—and uses the plural, to say his recantation does not refer to both codefendants adopts a strained interpretation of the words Evans used.

¶ 42    The majority and the State make much of the fact that the latter parts of the affidavit focus on Evans's identification of Smith, while not mentioning Calhoun by name. Of course it does not mention Calhoun by name. Evans wrote the affidavit at the behest of Smith and Smith's appointed postconviction attorney. Smith and his attorney were not concerned about Calhoun's misidentification by Evans but only Smith's.

¶ 43    Since the affidavit refers to both codefendants (albeit with more detail as to Smith), we must determine whether it meets the actual innocence standard: (i) newly discovered, (ii) material and not merely cumulative, and (iii) of such conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32. Evans's affidavit is plainly "newly discovered," as Evans says that he did not doubt his identifications before trial and he did not tell anyone of his doubts until 2012. There was no opportunity for Calhoun to obtain Evans's recantation before trial. It is material because Evans was the main witness against Calhoun (as the other state witnesses had recanted) and not cumulative because Evans had never recanted before. See *Smith*, 2015 IL App (1st) 140494, ¶¶ 19-20.

¶ 44    The majority rejects Calhoun's claim on the third factor: whether the affidavit is sufficiently conclusive. When Smith presented this affidavit, the *Smith* court held that it demonstrated a probability sufficient to undermine confidence in the outcome because without any physical evidence, "Evans's testimony was the strongest evidence against Smith." *Smith*, 2015 IL App (1st) 140494, ¶ 22. That reasoning applies equally and leads to the same conclusion for Calhoun. Further, Evans's recantation was more than "mere impeachment" because the recantation exonerated Smith and named a different perpetrator. *Id.* ¶ 23. (Again, the affidavit concerned Smith and hence did not contain much detail about Calhoun.)

¶ 45    Beyond *Smith*'s analysis, the affidavit also outlines several weaknesses in Evans's identifications, which apply in all respects to Calhoun as well. Evans only viewed the shooters by a "glimpse of light from the street lights" during the evening hours. Because they were upset over the victim's death, Evans and his friends "decided" that Smith and Calhoun were the shooters; Evans wanted to blame someone. And Smith and Calhoun were members of a rival gang that, according to Evans's trial testimony, had been "at war" with Evans's gang. Evans misidentified Smith, despite having known Smith and Calhoun for many years, because he saw a shooter with "a lot of hair" and knew that Smith "had a lot of hair." Taken as true, Evans's affidavit admits that his powers of identification were poor, that he concluded Smith was responsible based on little evidence, and that he was motivated to blame Smith and Calhoun. And Evans's misidentification of Smith makes his identification of Calhoun less credible. To repeat, while the affidavit contains more details as to Smith, it is also sufficiently "conclusive" in regard to Calhoun. See *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009) (where newly discovered evidence directly contradicts recanted testimony of two State witnesses, and no physical evidence tied defendant to murder, "all of the facts and surrounding circumstances *** should be scrutinized more closely to determine the guilt or innocence of [defendant]" (internal quotation marks omitted)).

¶ 46    Moreover, the difference in detail can be attributed to the different procedural histories of Calhoun's and Smith's postconviction cases. The evidence against these two men was exactly the same. What appears to have led to the ambiguity in the Evans affidavit as to Calhoun is that Calhoun first alleged that he was actually innocent in 2012. At that time he used the Banks and

Robinson affidavits as support. The trial court did not allow his petition to go forward. When Smith used the Banks and Robinson affidavits to support his own postconviction petition, the trial court found Smith's evidence compelling enough to appoint him counsel; only with an attorney's assistance was Smith able to obtain Evans's affidavit, which this court then found sufficient to warrant further proceedings.

¶ 47     The two codefendants' fortunes diverged in their postconviction proceedings. If Calhoun had had appointed counsel after his 2012 postconviction petition (based on the Banks and Robinson affidavits), that attorney presumably could have contacted Evans and obtained an affidavit from him supporting Calhoun's claim—or, at the very least, stating that he was now unsure about his identifications. At this point, I can see no reason why this court should have appointed counsel for Smith but rejected counsel for Calhoun outright.

¶ 48     The weakness of the State's case against Calhoun and Smith also argues for allowing Calhoun's postconviction petition to go forward. The State relied only on the testimony of three eyewitnesses, all of whom were asked to identify two men in a moving car several hours after sunset (the shooting took place at about 10:00 p.m., while the sunset was at 7:32 p.m.), during the firing of dozens of gunshots. There was no physical evidence inculpating either Calhoun or Smith—in fact, the only physical evidence seemed to link the crime to another man, who was not charged. At trial, two of the three eyewitnesses recanted their earlier identifications. Thus, the only positive identification of either Smith or Calhoun came from Evans, a member of a rival gang, and he now has recanted both of those identifications. (It is true that Robinson and Banks's recantations have already been rejected by the trial court, but Evans's recantation should inspire us to reexamine them. If Evans also had recanted at trial, this might have affected the trial court's conclusion that Robinson and Banks were not credible.) The majority's conclusion leaves open the possibility that Smith could be declared actually innocent and walk free while Calhoun would remain imprisoned, though the evidence against him is no more persuasive than the evidence against Smith.

¶ 49     I believe Calhoun has been dealt a grave injustice. A reversal would merely require Calhoun receive the benefit of appointed counsel, as Smith had, and, presumably, the opportunity to obtain an affidavit from Evans focusing on him. We can speculate and presume and assume about what Evans might say, but rather than run the risk of two codefendants suffering different fates on a matter of chance, Calhoun should be given the same opportunity as Smith to prove his innocence with the assistance of counsel.