2020 IL App (1st) 171136-U

No. 1-17-1136

Order filed July 31, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 26725 |
| | ) | |
| CHRISTOPHER KIRK, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Where defendant presented a colorable claim of actual innocence based on newly discovered evidence, the summary dismissal of his postconviction petition is reversed and the cause is remanded for second-stage proceedings. The order assessing fees and costs for filing a frivolous pleading is vacated.

¶ 2     Defendant Christopher Kirk, who was found guilty of two counts of aggravated criminal sexual assault under an accountability theory, appeals from the summary dismissal of his *pro se* petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2016)). On appeal, defendant contends that his petition presented an arguable claim of actual innocence based on newly discovered evidence where he attached an affidavit from a codefendant, averring that the codefendant had consensual sex with the victim in a closed room while defendant was not in the room. Defendant also argues that an order assessing fees and costs for filing a frivolous pleading must be vacated. For the reasons that follow, we reverse the summary dismissal, vacate the order assessing fees and costs, and remand for second-stage proceedings.

¶ 3     Defendant's conviction arose from the events of October 15, 2005. Following arrest, defendant and two codefendants, Ralph Kings and Victor Hill, were charged with multiple counts of criminal sexual assault, aggravated criminal sexual assault, kidnapping, and aggravated kidnapping. The cases were severed. Hill was tried and acquitted prior to defendant's trial. Kings, who went to trial in 2010, two years after defendant, was convicted of aggravated criminal sexual assault and aggravated kidnapping and sentenced to consecutive terms of 40 and 20 years in prison. This court affirmed his convictions and sentences. *People v. Kings*, 2012 IL App (1st) 102011-U.

¶ 4     At defendant's 2008 jury trial, the State nol-prossed 22 counts and proceeded on 2 counts of aggravated kidnapping and 10 counts of aggravated criminal sexual assault. The facts adduced at trial were set forth in our order on direct appeal. However, due to the nature of defendant's current claim, we will repeat the relevant facts here.

¶ 5     D.W. testified that on the day in question, she was 14 years old. About 5:30 p.m., she was walking home from the library at 95th and Halsted Streets in Chicago when "Person A," later identified as Kings, tried to talk to her. She kept walking and Kings asked her to stop, but she did not. "Person B," later identified as defendant, approached them and stayed about six inches behind. D.W. recalled that it was still light out at this time, and that she had previously seen defendant and

Kings on 95th Street and the Dan Ryan Expressway. After D.W. declined Kings's invitation to come to his house, he grabbed her wrist and picked her up. She screamed, flailed her arms and legs, and told him to put her down. As she was trying to get down, she was not looking for defendant and did not see him, but knew he was still walking behind them.

¶ 6 Kings carried D.W. into the yard of a house on the 9900 block of South Lowe Avenue, where a girl was raking leaves. Defendant was close behind them. D.W. screamed and told the girl to tell Kings to put her down, but the girl did not respond. Kings carried her down a few steps into the basement. Defendant was less than six inches behind them, and they all entered a large room where two men and one woman were watching television or playing a video game. Kings carried her into a bedroom, and defendant "came into the room, too." When she was in the bedroom, the door was closed, there was no light on, and she could not tell what the room looked like.

¶ 7 Kings threw D.W. on the bed and when she got up and tried to leave, defendant yanked her back on the bed. Kings got on top of her, kissed her, and began to remove her clothing while she tried to stop him. At this time, defendant was standing and watching about six inches away. Once Kings pulled off her pants and underwear, he vaginally raped her while defendant watched. Defendant then left the room while Kings continued to rape her.

¶ 8 When defendant returned, Kings stood up and defendant vaginally raped her and kissed her face. Kings, meanwhile, masturbated and ejaculated on her hair. D.W. eventually pushed defendant off her and they both fell to the floor. Defendant then placed her back on the bed, and Kings raped her again while defendant held her legs down and apart. "Person C," later identified as Hill, entered the bedroom and started touching and kissing her.

¶ 9     At this point, an unidentified man entered the bedroom. He told Hill, defendant, and Kings that a woman upstairs had heard screaming and wanted to know what they were doing to the girl. D.W. grabbed what she could of her clothing and ran out of the house. As she did so, she noticed that the three people who were in the larger room in the basement when they entered were still there.

¶ 10     D.W. testified that when she exited the house it was dark outside. She ran to Wallace Street, where she told a woman that she had just been raped. D.W. asked to use her phone and called her sister. The woman called the police, and two officers arrived 10 minutes later. They drove D.W. to the house on South Lowe, where she identified Hill, but defendant and Kings were no longer there. D.W. then went to the hospital, where she talked to detectives and described defendant as a black male between 16 and 17 years of age, about five feet five inches tall, stocky or chubby with a medium complexion, a "little Afro," and wearing a blue hood.

¶ 11     A few days later, on October 19, 2005, D.W. identified defendant in a set of photographs presented to her by police. On October 28, 2005, she saw defendant on the 79th Street Red Line train platform and immediately called police, who arrested him.

¶ 12     Aranna Denise Mays testified that in the early evening of October 15, 2005, she saw D.W. crying outside her home on Wallace. When D.W. asked to use her telephone and called a relative, Mays overheard her say that she had been raped. D.W. was at May's house for about 45 minutes before the police arrived.

¶ 13     Chicago police officer Felicia Jones testified that on October 15, 2005, she met with D.W., who was scared and crying hysterically. D.W.'s clothing was disheveled and her pants were unfastened. Jones had a brief conversation with D.W., but not a more extensive one, because she

was too upset. D.W. described "the one young man," but "didn't really see" the other two offenders. She could only describe the general age range of one of the other two, who had a tattoo. Jones could not recall D.W. describing the third offender. Jones's report indicated that D.W. told her two of the offenders raped her vaginally and anally and the third offender was black and between 19 and 21 years of age.

¶ 14    Chicago police detective Brian Forberg testified that on the day of the incident, he went to the hospital to talk to D.W., who was visibly upset. D.W. told him that defendant and Kings masturbated alongside the bed at different points during the attack, and Kings ejaculated on her neck and part of her body. Forberg further testified he "believe[d]" D.W. stated that only defendant and Kings were in the room when a fourth unknown person informed them about the woman upstairs.

¶ 15    On October 28, 2005, Forberg and his partner interviewed defendant, who told them that he did not know Kings. Defendant was then confronted with certain aspects of the investigation. He subsequently admitted he knew Kings and had last seen him in early October, but stated he did not know about the incident and was not present during it. After defendant was informed that D.W. placed him at the scene of the crime, he admitted that he was in the basement playing video games, and that Kings was in the back room with D.W., but he stated that he did not know "what was going on." When he was told D.W. identified him as one of her attackers, he said that he knew "what was going on," but denied any involvement.

¶ 16    Chicago police officer Darren Foster testified that on October 28, 2005, he arrested defendant at the train station at 79th. Foster approximated defendant was five feet eight inches tall and weighed 152 pounds. Defendant had a medium complexion and a short hairstyle.

¶ 17    The parties stipulated that semen was identified in the rectal and vaginal swabs obtained from D.W. and matched the DNA profile of Kings, but not Hill or defendant. No semen was identified on the swab obtained from D.W.'s neck.

¶ 18    The parties further stipulated that the right hand fingernail scrapings obtained from D.W. contained a mixture of DNA profiles, including D.W. and a partial unknown male. The body fluid source of the male DNA profile and the length of time it had been there could not be determined. D.W.'s left hand fingernail scrapings also contained a mixture of DNA profiles, including D.W., an unknown gender, and an unknown male. The body fluid source of this DNA mixture and the length of time it had been under the fingernail was undeterminable.

¶ 19    The parties also stipulated that two semen stains were removed from D.W.'s underwear. The sperm fraction of the stains matched the DNA profile of Kings, but not defendant or Hill. A mixture of DNA profiles identified in the non-sperm fraction of the semen stains was consistent with having originated from at least three people. Kings and D.W. could not be excluded as contributors. The gender and the body fluid source of the third donor, and the length of time it was present on the underwear, could not be determined.

¶ 20    Doctor Francisco Rosales testified that he examined D.W. at the hospital. He found her injuries consistent with vaginal trauma, but he could not complete the exam due to the pain she exhibited. He found no trauma in the anal area and prescribed antibiotics to prevent sexually transmitted diseases.

¶ 21    Monique Hill testified for the defense that Kings and Hill were her cousins and that she had known defendant for six years.[1] In October 2005, she resided with Kings, Hill, and several other people in the house on the 9900 block of South Lowe. One of the bedrooms in the basement did not have windows, and a person in the room could not see anything if the door were closed and the lights were off. She further testified that at 5 p.m. on October 15, 2005, she saw Kings and D.W. kissing on the side of the house. She later saw them on the back stairs, with D.W. sitting on Kings's lap and hugging him.

¶ 22    Monique then went to the front of the house and was unaware of whether D.W. and Kings went inside. While Monique was inside the house, Kings and defendant were in the basement, and she was told that Hill was also there. She further stated that if she were on the first floor of the house, she could not tell if people were entering or leaving the basement through the back door. Monique later testified that she did not know what happened in the basement and whether Kings, Hill, and defendant were in the basement, but she assumed that they were there.

¶ 23    The jury found defendant guilty of two counts of aggravated criminal sexual assault under a theory of accountability for Kings's actions, but not guilty of aggravated kidnapping and personally committing sexual assault. Specifically, the jury signed two guilty verdict forms stating it found defendant guilty of "Aggravated Criminal Sexual Assault, (Ralph King[s]'s Penis to Vagina Act #1)," and "Aggravated Criminal Sexual Assault, (Ralph King[s]'s Penis to Vagina Act #2)." The trial court entered convictions on count II, which alleged Kings committed penetration and caused bodily harm, and count VII, which alleged separate contact between the penis of "one

---

[1] Because Monique Hill and Victor Hill have the same last name, we refer to Monique Hill by her first name.

of the offender[s]" and D.W.'s vagina during a kidnapping. The court subsequently sentenced defendant to consecutive terms of nine and six years in prison on those counts, respectively.

¶ 24    On direct appeal, defendant contended that the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated sexual assault. Defendant claimed D.W. misidentified him as Person B because she "didn't really see" the other two offenders, gave conflicting accounts of what Person B did, and gave a description of Person B that was vague and did not match him. Defendant also claimed that he was exonerated because DNA evidence excluded him. We affirmed. *People v. Kirk*, No. 1-08-2417 (2010) (unpublished order under Supreme Court Rule 23).

¶ 25    Subsequently, defendant filed a *pro se* petition for *mandamus* and two *pro se* petitions for relief pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)). The circuit court denied each petition, and on appeal, we affirmed. *People v. Kirk*, Nos. 1-13-0897 (2014), 1-17-0143 (2019), 1-17-1616 (2019) (unpublished summary orders under Supreme Court Rule 23(c)).

¶ 26    On January 30, 2017, defendant filed the *pro se* postconviction petition at issue in the instant appeal. In the petition, defendant argued that the evidence was insufficient to sustain his convictions, he was actually innocent based on newly discovered evidence, and he received ineffective assistance of trial and appellate counsel. Regarding his actual innocence claim, defendant asserted that he had "recently obtained" the new evidence, namely, an affidavit by Kings. According to defendant, Kings's affidavit showed that he "was not involved in this crime," and alongside the DNA evidence, "supports [his] a[ss]ertions of 'Actual Innocen[ce].' " Defendant stated that his proposed evidence could not have been obtained sooner, as he "had no legal

- 8 -

knowledge that this evidence was sti[ll] binding after Post-Conviction counsel's omission and dismissal of his petition by this Honorable Court."

¶ 27     In the attached affidavit dated June 20, 2016, Kings averred, in total, as follows:

"On October 15th, 2005, at [the address on the 9900 block of] S. Lowe, Chicago, Illinois, I had consensual sex with [D.W.]. During our whole/full sexual encounter [D.W.] and myself was alon[e] inside a closed room. Christopher Kirk was outside said room during mentioned sexual encounter. And Christopher Kirk never entered, or attempted to enter, said room while [D.W.] and I was having sex.

I've previously testified, in open court, in front of a jury, to the above. And if called to do it again I will."

¶ 28     The circuit court summarily dismissed the petition on April 4, 2017, finding that defendant had failed to present a cognizable claim of actual innocence and that his remaining claims were frivolous and patently without merit. The circuit court also ordered defendant to pay $105 in fees and costs for filing a petition that was "entirely frivolous." 705 ILCS 105/27.2a (West 2016); 735 ILCS 5/22-105 (West 2016).

¶ 29     On appeal, defendant contends that summary dismissal of his petition was improper because he presented an arguable claim of actual innocence based on newly discovered evidence that Kings did not commit the relevant underlying offenses, and moreover, defendant was not accountable for Kings's actions.[2] In the alternative, he argues that if Kings did commit a crime

---

[2] Defendant does not argue his postconviction claims of ineffectiveness or his postconviction challenge to the sufficiency of the evidence on appeal.

against D.W., Kings's averment that defendant never entered the room would show that defendant did not intend to aid, abet, or attempt to aid Kings.

¶ 30    In cases not involving the death penalty, the Act provides a three-stage process for adjudicating petitions alleging that a conviction resulted from a constitutional violation. 725 ILCS 5/122-1 (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The instant case involves the first stage, during which the circuit court independently assesses the petition, taking the allegations as true. *Hodges*, 234 Ill. 2d at 10. Based on this review, the circuit court must determine whether the petition "is frivolous or is patently without merit," and, if it so finds, dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2016). Our review of a first-stage dismissal is *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 31    A petition may be dismissed as frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition has no arguable basis in law when it is founded on "an indisputably meritless legal theory," for example, a legal theory that is completely belied by the record. *Id.* A petition has no arguable basis in fact when it is based on a "fanciful factual allegation," which includes allegations that are "fantastic or delusional" or contradicted by the record. *Id.* at 16-17; *People v. Morris*, 236 Ill. 2d 345, 354 (2010).

¶ 32    A postconviction petitioner may assert a claim of actual innocence where the claim is based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Such evidence must be newly discovered, material and not cumulative, and, most important, of such conclusive character that it would probably change the result on retrial. *Id.*; *People v. Coleman*, 2013 IL 113307, ¶ 84. Evidence is considered new where it was discovered after trial and could not have

been discovered earlier through the exercise of due diligence; material where it is relevant and probative of the petitioner's innocence; noncumulative where it adds to what the jury heard; and conclusive where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. We consider each element in turn.

¶ 33    Defendant asserts that Kings's affidavit was newly discovered because Kings was a codefendant and no amount of diligence could have forced him to waive his fifth amendment rights. The State correctly concedes that Kings, as a codefendant, could not have been compelled to testify at defendant's trial. See *People v. Molstad*, 101 Ill. 2d 128, 134-35 (1984) ("because such testimony would have incriminated them," the codefendants' testimony "clearly qualifies as newly discovered evidence"); see also *People v. Edwards*, 2012 IL 111711, ¶ 38 (evidence in affidavit qualified as "newly discovered" where affiant was a codefendant with a fifth amendment right to avoid self-incrimination). Nevertheless, the State maintains that Kings's potential testimony would have been available to defendant after Kings testified at his own trial in 2010.[3] As such, according to the State's argument, defendant could have discovered this evidence through an exercise of due diligence sooner than 2017, the year he filed his postconviction petition. In addition, the State argues that defendant could have presented the evidence contained in Kings's affidavit through other witnesses who were present in the basement.

¶ 34    The State's argument regarding diligence was rejected by this court in *People v. Smith*, 2015 IL App (1st) 140494. In *Smith*, an eyewitness testified at a 2003 murder trial that the

_____

[3] Kings did not specify in his affidavit when it was that he "previously testified, in open court, in front of a jury, to the above." However, according to this court's order affirming Kings's convictions, "In his case-in-chief, [Kings] presented testimony—from his cousin, his sister, and himself—to suggest that the encounter between him and D.W. had been consensual." *Kings*, 2012 IL App (1st) 102011-U, ¶ 3. Thus, it appears that Kings refers to his testimony at his own 2010 trial.

defendant was the shooter. *Id.* ¶ 4. In 2010, the defendant filed a postconviction petition. *Id.* ¶ 12. In 2012, the defendant supplemented the petition and attached an affidavit in which the eyewitness averred he had developed "doubts" about the accuracy of his trial testimony but did not inform anyone until the summer of 2012. *Id.* The State argued that the eyewitness's recantation was not newly discovered evidence because the defendant failed "to show that he could not have learned of [the eyewitness's] doubts about his identification [testimony] 'prior to the middle of 2012.' " *Id.* ¶ 19.

¶ 35    This court rejected the State's argument, observing that the law did not require the defendant to make such a showing. *Id.* Instead, we emphasized that a defendant "need only demonstrate that his failure to discover the evidence *prior to trial* was not due to a lack of diligence." (Emphasis in original.) *Id.* In support of this holding, we cited *Molstad* and *People v. Wingate*, 2015 IL App (5th) 130189. See *Molstad*, 101 Ill. 2d at 134 (new evidence " 'must have been discovered since the trial and be of such character that it could not have been discovered *prior to trial* by the exercise of due diligence' ") (emphasis added) (quoting *People v. Baker*, 16 Ill. 2d 364, 374 (1959)); *Wingate*, 2015 IL App (5th) 130189, ¶ 28 (where the defendant did not show that he could not have discovered a witness "*prior to the *** trial*," the evidence was not newly discovered (emphasis added)).

¶ 36    Here, Kings's proposed testimony is newly discovered because "no amount of diligence could have forced" Kings to testify at defendant's trial in 2008 and "violate [his] fifth amendment right to avoid self-incrimination." *Molstad*, 101 Ill. 2d at 135; see also *Edwards*, 2012 IL 111711, ¶ 38. Where Kings was a codefendant, defendant has made the requisite showing of diligence in discovering his affidavit. See *Smith*, 2015 IL App (1st) 140494, ¶ 19.

¶ 37    As for the State's argument that defendant could have presented the substance of the evidence contained in Kings's affidavit through other witnesses who were present in the basement, we disagree. In his affidavit, the allegations of which we must take as true prior to the third stage of postconviction proceedings (see *People v. Sanders*, 2016 IL 118123, ¶ 42), Kings described a "sexual encounter" that occurred solely between himself and D.W. in a "closed room." Kings did not state that anyone else was inside the room and specified that defendant was outside the room during the "sexual encounter." In these circumstances, no one outside the room could have provided the evidence presented in Kings's affidavit that the "sexual encounter" was consensual.

¶ 38    With regard to the second and third elements, the State does not argue that Kings's affidavit is immaterial or cumulative, and we agree with defendant that it is neither. Evidence is material if it is "relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. Kings's assertion that his "sexual encounter" with D.W. was consensual is certainly relevant and supports defendant's claim that he is innocent of the crimes of which he was convicted. See *Smith*, 2015 IL App (1st) 140494, ¶ 20. Evidence is noncumulative where it adds to what the jury heard. *Coleman*, 2013 IL 113307, ¶ 96. Here, no one testified that the "sexual encounter" was a consensual act involving only Kings and D.W. As such, Kings's proposed testimony would add to what the jury heard.

¶ 39    The final element is whether the proposed new evidence, when considered along with the trial evidence, would probably lead to a different result on retrial. *Coleman*, 2013 IL 113307, ¶ 96. There is no requirement that the new evidence be entirely dispositive to be likely to alter the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶¶ 48, 56. "Rather, the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a

different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56. Probability, not certainty, is key in determining whether the fact finder would reach a different result after considering the trial evidence along with the new evidence. *Id.* ¶ 48.

¶ 40    Taking Kings's averments as true, we agree with defendant that he has made an arguable showing that Kings's proposed testimony would probably result in a different outcome on retrial. At trial, only D.W. testified as to what happened inside the closed bedroom in the basement. Kings's averments would directly contradict D.W.'s testimony regarding who was in the bedroom and whether what occurred there was consensual. If Kings's sexual conduct with D.W. was "consensual," then it was not performed "by the use of force or threat of force" (720 ILCS 5/12-13(a)(1) (West 2004)), or in the course of a kidnapping where D.W. was confined "against h[er] will" by "force or threat of imminent force" (720 ILCS 5/10-1(a)(1)(2) (West 2004)), essential elements of the counts of aggravated criminal sexual assault for which defendant was found accountable.[4] See 720 ILCS 5/12-14(a)(2), (4) (West 2004). And if Kings did not commit those crimes, defendant may not be held accountable. *People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 38.

¶ 41    Where newly discovered evidence is both exonerating and contradicts a State's witness, it is capable of producing a different outcome on retrial. *Ortiz*, 235 Ill. 2d at 336-37; see also *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36; *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49. Kings's proposed testimony, taken as true, would exonerate defendant of accountability and directly contradict D.W.'s trial testimony. Thus, at retrial, the evidence of defendant's innocence

---

[4] We are mindful that D.W. testified that she was under 17, the age of consent in Illinois. See *People v. Lloyd*, 2013 IL 113510, ¶ 30. However, the State did not charge defendant or Kings with offenses based on D.W.'s age, and we may only consider the evidence regarding the actual charges the State chose to bring. *Id.* ¶ 45; see also *People v. Washington*, 171 Ill. 2d 475, 489 (1996) (holding that "a claim of newly discovered evidence showing a defendant to be actually innocent of the crime *for which he was convicted* is cognizable as a matter of due process" (emphasis added)).

would be stronger when weighed against D.W.'s version of events. See *Ortiz*, 235 Ill. 2d at 337; *Adams*, 2013 IL App (1st) 111081, ¶ 37. We find it arguable that the new evidence would probably change the outcome on retrial. Defendant has met the criteria to warrant second-stage postconviction proceedings. Accordingly, we reverse the circuit court's summary dismissal of the petition.

¶ 42    Finally, we turn to defendant's argument that the circuit court's order assessing $105 in fees and costs for filing a frivolous pleading (see 705 ILCS 105/27.2a (West 2016); 735 ILCS 5/22-105 (West 2016)) should be vacated. As defendant notes, these assessments only apply to frivolous filings. *People v. Sparks*, 393 Ill. App. 3d 878, 887-88 (2009). Because we have concluded defendant's petition presented an arguable claim of actual innocence so as to avoid dismissal for being frivolous and patently without merit, the assessment of the fees is negated. *Id.* at 888. As such, we vacate the order assessing $105 in filing fees and court costs.

¶ 43    For the reasons explained above, we reverse the summary dismissal of defendant's petition and remand for second-stage postconviction proceedings. The assessment of $105 in filing fees and court costs is vacated

¶ 44    Reversed in part and vacated in part; cause remanded.