2021 IL App (1st) 151962-U

No. 1-15-1962

Order filed March 2, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 21488 |
| | ) | |
| CORDERO AMOS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where defendant presented an arguably meritorious claim of actual innocence based on newly discovered evidence, the summary dismissal of his postconviction petition is reversed and the cause remanded for second-stage proceedings.

¶ 2    Defendant Cordero Amos appeals from the summary dismissal of his postconviction petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). He contends that the petition should advance to the second stage because he presented an actual innocence claim based on evidence that was new, material, noncumulative and

likely to change the outcome on retrial. For the following reasons, we reverse and remand for second-stage proceedings under the Act.

¶ 3 Following a 2013 jury trial, defendant was convicted of the October 13, 2010, first degree murder of Lawrence Stubbs and sentenced to 40 years' imprisonment. Defendant appealed his conviction, and, in an agreed order, this court directed that defendant's mittimus be corrected to reflect one conviction and 40-year sentence for first degree murder. *People v. Amos*, No. 1-13-2203 (2014) (unpublished summary order under Supreme Court Rule 23).

¶ 4 Defendant and Robert Butler were charged by indictment with eight counts of the first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West Supp. 2009)) of Stubbs, two counts of home invasion (720 ILCS 5/12-11(a)(3), (4) (West 2008)), and one count of residential burglary (720 ILCS 5/19-3(a) (West 2008)). The case proceeded to simultaneous but severed trials on the murder charges, at which defendant was tried by a jury and Butler elected a bench trial.

¶ 5 At trial, Nedra Poe testified that Stubbs was her son. On October 13, 2010, Stubs went to C'Erica Rutledge's house, a few blocks away from Poe's house, to pick up his cellphone.[1] Poe later heard he had been shot and she saw him bleeding on the floor at Rutledge's house. Stubbs died later that day.

¶ 6 Rutledge testified that on October 13, 2010, she stayed home from CVS High School because she was sick. Stubbs arrived at her house on the 8900 block of South Bishop that morning to pick up his cellphone. Rutledge gave the phone to him, returned to bed, and heard the screen door. As soon as Stubbs left, Rutledge heard "about 15 gunshots, probably more" and fell to the floor. After the shots ended, she heard Stubbs call for help and she exited her room. Stubbs walked

_____

[1] Poe identified Rutledge by her first name.

from the front door and said, "they shot me." He then turned around and showed Rutledge his gunshot wound. Blood poured from a hole in his back, and she wrapped a bed sheet around him to stop the bleeding. Stubbs became weaker and Rutledge tried to hold him up but ended up laying him on the floor. Stubbs repeated they shot me and told her what to tell his family. When the paramedics arrived Stubbs was in and out of consciousness. Rutledge did not see a firearm next to Stubbs, who later died from his injuries.

¶ 7    On cross-examination, Rutledge testified Stubbs lived a couple blocks away from her. She clarified that she heard the screen door open when Stubbs left but did not hear the screen door or front door close. When the screen door opened, she heard the gunshots which came from outside of the house.

¶ 8    William White testified that he knew Stubbs and Rutledge and lived on 90th Street and Bishop in the same area as Stubbs. On October 13, 2010, at about 11:00 a.m., White was walking from the library on 88th Street and Loomis Street with a friend. On the corner of 89th Street and Bishop, White heard 20 to 25 gunshots, and then he saw a "greenish" Dodge Stratus coming from the alley behind Rutledge's house. Two men ran down Bishop towards him. White identified Butler as one of the two men in court. He initially did not identify defendant, but when the State asked him to stand and look around the courtroom, he identified defendant. White related that, Butler entered the driver side backseat and defendant entered the passenger side back seat of the Dodge Stratus, which was 15 to 20 feet away from White. White went to Rutledge's house where he saw Stubbs and Rutledge in the front room. White left the scene, was arrested later that day with a firearm and told police what he had seen. He also identified Butler and defendant in separate

photo arrays, and Butler in a lineup. White could not recall identifying someone in a lineup on November 6, 2010, and prior to the shooting had never previously seen defendant or Butler.

¶ 9      On cross-examination, White testified he did not see the shooting. When he spoke with police he could not state how tall defendant and Butler were, what clothes they wore, their hairstyle. He identified defendant in a photo array of six that included a man he already identified as being the codefendant, Butler. White told police he was not certain about the identification of defendant. When defense counsel presented White with a photo of the lineup from November 2010, he testified that he did not remember the lineup.

¶ 10      Cook County sheriff's officer Pacola Bibbs testified that on October 13, 2010, she and her husband visited her mother, who lived on the opposite side of the street from Rutledge's house. Bibbs got in an argument with her husband, who exited the house. She heard two or three gunshots, and ran out of the back of the house and through the gangway on the side of the house to get to the front. She saw two men diagonally cross South Bishop towards her side of the street. One man was tall and dark skinned, and the other was shorter and light skinned. The light skinned man had a firearm in his right hand. A woman cried for help and she went to Rutledge's house where a man had multiple gunshot wounds and lay on the ground. Bibbs called 911 and spoke with police when they arrived. The next day she identified defendant in a photo array as the light skinned man running away on October 13, 2010. She also identified defendant in court. On October 15, 2010, she did not identify anyone in a lineup that included Butler. On November 6, 2010, she viewed a lineup and identified two men as possibly being the light-skinned man she saw with the firearm. One of the men was defendant. In October 2012, Bibbs spoke with an investigator, Kenyatta Taylor, about the case but was drowsy from medicine after a sinus infection.

¶ 11    On cross-examination, Bibbs testified that she did not tell officers about the eye color, facial hair or outfits of the two men fleeing the scene. She explained that when she spoke with Taylor, who worked for the defense, she could not remember why she initialed the photo array identifying defendant. She denied being presented a photo of Stubbs. She acknowledged that she could not remember much about the two men running on October 13, 2010, because she was focused on the passing of her mother-in-law and the argument with her husband.

¶ 12    Chicago police officer Tom Shannon testified that on October 13, 2010, at 11 a.m. he saw a gray Dodge pull into the side emergency room drive of Little Company Hospital. The front passenger reached over, opened the back door and pushed a man with a gunshot wound from the rear of the car. Shannon identified the man pushed out of the Dodge as Butler in court. Shannon had heard on the radio there was a shooting at 89th and Bishop and relayed the license plate number of the Dodge over police radio.

¶ 13    At the hospital, Butler was treated which involved taking all his belongings to assess his injuries. Shannon accessed Butler's belongings and attempted to contact Butler's family with his cellphone. As Shannon used the phone, a text message "popped up." It stated, "I needa pipe cuzz ASAP." Shannon testified "pipe" is a slang term for a firearm. The text's date and time showed it was sent on October 13, at 9:49 a.m. Shannon called an evidence technician to the hospital to test Butler for gunshot residue. On cross-examination, Shannon acknowledged that "pipe" is also a street term for something used to smoke "crack" or cannabis.

¶ 14    Tiffany Bennett testified that on October 13, 2010, between 9 and 10 a.m., she received a call from her friend Marcus Russell, who asked Bennet to switch cars with him because of an emergency. Bennet, who drove a gray Dodge Stratus, agreed. They switched cars at a McDonald's

restaurant on 95th Street and Halsted Street "probably around 10 or 10:30" a.m. Defendant, Butler and another man were with Russell. Bennett had seen defendant and Butler a couple times before with Russell and knew defendant as "Red." She identified defendant and Butler in court. About 5 or 6 p.m., Russell, defendant and possibly the man from the morning, returned the car to her at her sister's residence in South Holland. The men told her Butler was not there because he was shot. Butler did not appear injured that morning. Later that night, Bennet permitted police to examine her car and saw blood in the back seat that was not there that morning. She also examined a photo array and identified defendant, Russell, and Butler. She later identified defendant in a physical lineup.

¶ 15    On cross-examination, Bennett stated she did not see any weapons on defendant, and the four men appeared calm at the McDonald's restaurant. When returning the car, Russell informed her Butler was shot. Defendant did not have blood on him at that time.

¶ 16    Chicago police evidence technician Kelly Comiskey testified that on October 13, 2010, she arrived at Rutledge's house on South Bishop to investigate a crime scene. Comiskey observed shell casings outside on the sidewalk and in the grass, and inside the house more casings and a lot of blood. She packaged the 15 discharged cartridge cases and the 1 fired bullet and assigned unique inventory numbers to the evidence. Comiskey explained that eight of the cartridge cases were recovered from the front exterior of the house, and seven cartridge cases and the fired bullet were recovered from the interior of the house. On cross-examination, Comiskey acknowledged that the shells did not prove who was firing, who fired first, and who had weapons.

¶ 17    The parties stipulated that, if called, Doctor Lawrence Cogan would testify that he performed an autopsy on Stubbs and found that Stubbs suffered a gunshot wound to his back. The

wound's direction was back to front, left to right and upward. Cogan recovered a bullet from Stubbs' abdominal cavity. Cogan's opinion was that the cause of Stubbs' death was a gunshot wound to the back and that the manner of death was homicide.

¶ 18    The parties also stipulated that, if called, forensic scientist Scott Ruchowicz would testify that he received a gunshot residue collection kit administered to Butler and examined the contents of the package. Ruchowicz's opinion was that Butler may not have discharged a weapon with either hand or if he did, then the particles were removed by activity, were not deposited or were not detected.

¶ 19    Officer Pulia testified that on October 15, 2010, at 7:40 p.m., he was on patrol and observed a large gathering in an alley located near 90th and Marshfield.[2] Pulia approached to conduct field interviews and one man fled. Pulia gave chase and after a struggle, with the help of other officers, he placed the individual under arrest and secured a firearm from the man, identified as Talrant Anderson. The firearm, a loaded .9-millimeter Taurus black semi-automatic, was inventoried and sent to the Illinois Police Crime Lab for testing and analysis.

¶ 20    Officer Daniel Pascelli testified that on September 23, 2011, at 12:45 p.m., he and a team of officers executed a search warrant on South Fairfield Avenue in Chicago. Vickie Donaldson was in the house. Pascelli searched a bedroom and recovered one high point, .9-millimeter semi-automatic handgun loaded with two rounds. The firearm was inventoried. He identified this firearm in court.

¶ 21    Forensic scientist Brian Parr testified, as an expert in the field of firearm identification, that he received and examined 15 cartridge cases and 2 fired bullets in relation to the shooting of

---

[2] Pulia's first name was not included in the record.

Stubbs. After an examination of the cartridge cases and bullets, Parr concluded that three separate firearms were used in the shooting. He concluded that eight fired cartridges including the seven found inside the house and one on the parkway were fired from one firearm, three cartridges recovered from outside the house were fired from another firearm, and an additional four cartridges recovered from outside the house were fired by a third firearm. In April 2011, he received notice of a firearm that may have been associated with the shooting. Parr analyzed the Taurus pistol recovered from Anderson and found that it fired the two fired bullets and four cartridge cases. He also conducted firearm analysis on a "gun where the suspect was William White" and found that none of the evidence was fired by that firearm.

¶ 22    Forensic scientist Diana Pratt testified, as an expert in firearms identification, that all the fired cartridges from inside the house and one from outside were ejected from the high point, .9-millimeter identified in court as the one recovered from the search of Donaldson's house.

¶ 23    Chicago police detective John Dougherty testified that on November 6, 2010, he administered a lineup to Bibbs, White, and Bennett. Bibbs "tentative[ly]" identified defendant and Ronald Jefferson as the men she saw running after the shooting. White identified defendant as one of the men who ran down Bishop and got into a vehicle at 89th and Bishop. Bennett identified defendant as one of the men present when she exchanged vehicles at the McDonald's restaurant.

¶ 24    Chicago police detective Brian Johnson testified that on October 13, 2010, he presented a photo array to Bennett, who identified defendant, Butler, and Russell as three of the people present when she gave her car to Russell. She identified defendant in a lineup. Johnson also presented a photo array to White, who identified Butler as one of the men who fled the scene after the shooting in a gray car. White also viewed a lineup and identified Butler. Just past midnight Johnson

presented another photo array to White, who "tentative[ly]" identified defendant as the person running from the scene with the firearm. Also, on October 14, 2010, Johnson presented a photo array to Bibbs, who identified defendant as the individual with the light complexion fleeing the scene with a firearm in his right hand. On cross-examination, Johnson testified that Bibbs identified two people in a lineup in November of 2010, that she believed could have been the man with the light complexion.

¶ 25    Defendant called Taylor to testify. On October 4, 2012, Taylor interviewed Bibbs, who described one of the offenders as short, with a light complexion, and having an "afro" and the other individual as tall, with a darker complexion and wearing braids. Bibbs told Taylor that the taller individual had a firearm in his right hand. Taylor showed Bibbs a photo array which included defendant that she had previously initialed for police. Bibbs did not remember why she had initialed the array or if defendant was armed, and she did not recognize a photo of Stubbs, the victim. On cross-examination, Taylor stated that Bibbs told her she was recovering from a sinus infection and "her head was all messed up."

¶ 26    The jury found defendant guilty of first degree murder, but not that he personally discharged a firearm. The court denied defendant's motion for new trial and sentenced defendant to 40 years' imprisonment for first degree murder. Butler was found guilty of second degree murder.[3]

¶ 27    Defendant appealed his conviction. On October 2, 2014, in an agreed order, this court directed that defendant's mittimus be corrected to reflect one conviction and 40-year sentence for

_____

[3] On direct appeal, this court in *People v. Butler*, 2015 IL App (1st) 131870, reversed the judgment in Butler's case and remanded for a new trial.

first degree murder. *Amos*, No. 1-13-2203 (2014) (unpublished summary order under Illinois Supreme Court Rule 23).

¶ 28    On March 31, 2015, defendant filed a *pro se* postconviction petition under the Act, alleging that: (1) his trial counsel was ineffective for failing to call Russell and Butler to corroborate his alibi defense; (2) his trial counsel was ineffective for informing him that, if he testified that Butler dropped him off at his grandmother's house prior to the shooting, he would be admitting his guilt; and (3) he was actually innocent. He also claimed that his appellate counsel was ineffective for failing to: challenge the sufficiency of the evidence; raise the issues of disparate sentences between defendant and Butler; and file documents in support of his innocence. In support of his petition, defendant attached an affidavit from Butler and himself.

¶ 29    In defendant's affidavit, he averred that he was not present or responsible in any way for the murder of Stubbs. He averred that, prior to the shooting, Russell and Butler dropped him off at his grandmother's house on 91st Street and Justine Street. He told his trial counsel this but she told him not to testify because he would look guilty being with Butler and Russell in the car prior to the shooting. He informed his appellate counsel of several issues but she did not file a brief, finding no issues that would enable relief.

¶ 30    In Butler's affidavit, he averred that defendant was neither present nor "responsible in any way" for the murder of Stubbs. Specifically, Butler stated he shot and killed Stubbs in self-defense and was only accompanied by one other person, "Lil Justin" also known as "Lil Gusto." Butler stated that, before he, "Lil Justin," and Russell went to 89th and Bishop to purchase drugs, they dropped off defendant on 91st and Justine at defendant's grandmother's house. Before leaving, defendant asked Russell for a ride in a few hours. Russell remained in the car as Butler and "Lil

Justin" attempted to purchase weed. Butler asked Stubbs and another individual if "they had weed for sale." Stubbs responded, they "should get away from there or there would be trouble," and Butler cursed at him before telling "Lil Justin" to go. As Butler turned to leave, he was shot, and fell to the ground before pulling out his firearm and returning fire. "Lil Justin" did not have a firearm. One individual ran into the house firing blindly and the other ran around back after shooting his firearm but Butler did not know who shot him. He ran back to Russell's car, told Russell that he had been shot and Russell drove him to the hospital. Butler averred that, because the shooting was not premeditated, defendant was not aware of it.

¶ 31    On May 6, 2015, the court summarily dismissed defendant's *pro se* postconviction petition at the first stage, finding there was no ineffective assistance of trial counsel and the petition lacked merit.

¶ 32    On appeal, defendant contends that the trial court erred in summarily dismissing his postconviction petition at the first stage because he set forth an arguably meritorious claim of actual innocence. He argues that Butler's affidavit is new, material, noncumulative and likely to change the outcome on retrial.

¶ 33    The Act permits a defendant to collaterally attack his conviction for substantial violations of his federal, state constitutional rights, or both. 725 ILCS 5/122-1(a)(1) (West 2014); *People v. English*, 2013 IL 112890, ¶ 21. The Act establishes a three-stage adjudication process. *English*, 2013 IL 112890, ¶ 23. Here, defendant's petition for postconviction relief was summarily dismissed at the first stage. At this stage the trial court independently reviews the petition, taking all well-pleaded facts as true, and determines whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2014). *People v. Coleman*, 183 Ill. 2d 366, 378 (1998);

*People v. Swamynathan*, 236 Ill. 2d 103, 113 (2010). "A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *People v. Tate*, 2012 IL 112214, ¶ 9. A claim has no arguable basis where it is grounded in " 'an indisputably meritless legal theory,' " which is a theory "completely contradicted by the record," or a " 'fanciful factual allegation,' " which includes those that are "fantastic or delusional." *People v. Brown*, 236 Ill. 2d 175, 185 (2010) (quoting *People v. Hodges*, 234 Ill. 2d 1, 16 (2009)).

¶ 34    To survive the first stage, a petition only has to present "the gist of a constitutional claim." *People v. Allen*, 2015 IL 113135, ¶ 24. Presenting a "gist" of a constitutional claim is a low threshold, and only limited detail is necessary for the petition to proceed beyond the first stage of postconviction review. *Hodges*, 234 Ill. 2d at 9-10. Despite this low threshold, however, a defendant is not excused from providing factual support for his claims and must show a sufficient factual basis to demonstrate that the allegations in the petition are "capable of objective or independent corroboration." *People v. Collins*, 202 Ill. 2d 59, 67 (2002). We review the summary dismissal of a postconviction petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 35    In this court, defendant contends that he set forth an arguably meritorious actual innocence claim based on newly discovered evidence from Butler's affidavit.

¶ 36    An innocent person's wrongful conviction violates due process under the Illinois Constitution and, therefore, a freestanding claim of actual innocence may be brought under the Act. See *People v. Washington*, 171 Ill. 2d 475, 489 (1996). To succeed on a claim of actual innocence, a petitioner must present evidence that is new, material and noncumulative, and of such a conclusive nature that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *Washington*, 171 Ill. 2d at 489).

¶ 37    Evidence is newly discovered when discovered after trial and "the defendant could not have discovered [it] sooner through due diligence." *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009). "Material means the evidence is relevant and probative of the petitioner's innocence." *Coleman*, 2013 IL 113307, ¶ 96. Noncumulative evidence adds new information not previously heard by the fact finder at trial. *Id.* The conclusive character element refers to evidence that, when considered together with the trial evidence, would probably lead to a different result on retrial. *Id.* The conclusive character of the new evidence is the most important element of an actual innocence claim. *People v. Robinson*, 2020 IL 123849, ¶ 47. Pursuant to these principles, we review defendant's claim of actual innocence based upon newly discovered evidence *i.e.* Butler's affidavit.

¶ 38    We initially note that all the information in defendant's own affidavit is information already known by him. Evidence is not new when it presents facts already known by the defendant at or prior to trial. *People v. Montes*, 2015 IL App (2d) 140485, ¶ 24. As defendant knew the necessary facts of his actions at or prior to trial, the information in his affidavit is not new. *Id.* Consequently, defendant's own affidavit does not entitle him to relief as the supporting evidence is not new.

¶ 39    The State does not contest that Butler's affidavit is newly discovered, noncumulative, and material evidence. First, Butler's affidavit is newly discovered because as a codefendant, Butler had a "fifth amendment right to avoid self-incrimination," and therefore "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so." *People v. Edwards*, 2012 IL 111711, ¶ 38 (citing *Molstad*, 101 Ill. 2d at 135). Second, the affidavit is not cumulative as the jury was not presented with any evidence that defendant was not at the shooting. See *Ortiz*, 235 Ill. 2d at 335 (stating that evidence is "cumulative when it adds nothing to what was already before

the jury."). Finally, the evidence is material because it goes to a central issue before the jury, whether defendant was present and participated in the shooting of Stubbs. *People v. Smith*, 2015 IL App (1st) 140494, ¶ 20 (evidence was material where it went to who was the shooter).

¶ 40     That said, we turn to the conclusive character element of Butler's affidavit. The most important element of an actual innocence claim is the conclusiveness of the evidence. *People v. Sanders*, 2016 IL 118123, ¶ 47. With respect to this element, ultimately, we ask "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48. The new evidence is not required to be "entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 41     Taking Butler's averments as true, given that credibility determinations may not be made at this stage (*id.* ¶ 45), we find defendant made an arguable showing that Butler's proposed testimony would probably lead to a different result on retrial. In his affidavit, Butler averred that defendant was not present or responsible in any way for the shooting. Butler explained that prior to the shooting, he, "Lil Justin," and Russell dropped defendant off at his grandmother's house. Russell agreed to pick defendant up before retrieving his vehicle from Bennet.[4] Only Butler and "Lil Justin" were present when the shooting occurred after an attempted drug purchase. Where, as here, newly discovered evidence is both exonerating and contradicts a State's witness, it is capable of producing a different outcome on retrial. *Ortiz*, 235 Ill. 2d at 336-37 (the identification of a different offender brought forth evidence that the facts should be analyzed more closely to

---

[4] Butler referred to Bennet by her first name.

determine the defendant's guilt or innocence); see also *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36.

¶ 42    The evidence in Butler's affidavit is not positively rebutted by the record. "[T]he existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Robinson*, 2020 IL 123849, ¶ 60. Rather, new evidence is positively rebutted only when it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* Here, the record does not affirmatively demonstrate that a trier of fact could never accept the veracity of Butler's statements.

¶ 43    At trial, none of the firearms used in the shooting were linked to defendant and there was no physical evidence of his involvement, or inculpatory statements by defendant. See *Robinson*, 2020 IL 123849, ¶ 84 (remanding a case for further proceedings where there was an inculpatory statement but no physical or forensic evidence and no eyewitnesses of defendant's involvement). The primary evidence was White and Bibbs', at times, tentative identifications of defendant fleeing the scene of the shooting, which conflicts with Butler's affidavit. Again, a conflict between new evidence and trial evidence is not the same as finding the evidence is rebutted. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 44    The State also presented evidence that three firearms were used with one leaving a single cartridge outside and seven inside the house. This corroborates Butler's affidavit that there were three shooters, including himself, and one ran into the house and shot blindly at him and "Lil Justin." A stipulation by the State was unable to rule out that Butler shot a firearm as any particles on him may have been removed by activity, not deposited or not detected by the procedure to find

gunshot residue. Furthermore, Bennet testified that there was a fourth man with defendant, Butler and Russell when they picked up her car at McDonald's, supporting Butler's affidavit that he was accompanied by "Lil Justin" that morning. Given this record we cannot say that the trier of fact could never accept the veracity of Butler's affidavit. *Id.* Ultimately, because the affidavit is not positively rebutted it must be taken as true. *Id.* ¶¶ 60, 61.

¶ 45 Taking Butler's affidavit as true, defendant was not at the shooting and had no knowledge that it would occur. This directly contradicts the identification testimony of White and Bibbs, who were at times tentative in their identification of defendant, and Bibbs could not explain her signature on defendant's photo array. In sum, the new evidence in Butler's affidavit places the trial evidence in a different light and undermines confidence in the finding of guilt. *Id.* ¶ 48.

¶ 46 Accordingly, we find defendant satisfied the low threshold applicable to first stage proceedings and set forth the gist of a claim of actual innocence by presenting a potential witness who averred that he, Lil Justin and Russell, and not defendant, were involved in the shooting of Stubbs. See *Id.* ¶ 73 (in the context of a motion for leave to file a successive postconviction petition alleging actual innocence, finding that a newly discovered eyewitness affidavit that contradicted, but was not positively rebutted by, the State's eyewitnesses regarding the identification of the offender was "a reason to allow [the] petitioner to proceed, with counsel, on his colorable claim of actual innocence").

¶ 47 For the reasons set forth above, we reverse the summary dismissal of defendant's petition and remand for second-stage postconviction proceedings under the Act.

¶ 48 Reversed; cause remanded.