2021 IL App (1st) 170001-U

No. 1-17-0001

Second Division
March 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 00 CR 20644 |
| v. | ) | |
| | ) | |
| SEAN MILLS, | ) | Honorable |
| | ) | Mary Margaret Brosnahan |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's denial of defendant's motion for leave to file a second successive postconviction petition is reversed and remanded where he presented a colorable claim of actual innocence based on attached affidavits.

¶ 2    Following a jury trial, defendant-appellant, Sean Mills, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2000)) and home invasion (720 ILCS 5/12-11(a)(1) (West 2000)) and was sentenced to concurrent terms of 45 and 20 years' imprisonment, respectively. He

now appeals from a judgment denying his motion for leave to file his second successive petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). Defendant argues that the trial court incorrectly determined that his claim of actual innocence based on two newly discovered affidavits was without merit. For the following reasons, we reverse the trial court's denial of defendant's motion and remand for further proceedings under the Act.

¶ 3                                        I. BACKGROUND

¶ 4      Defendant's convictions arose from the December 1999 fatal shooting of Thomas Walker, which occurred during a home invasion at 7438 South Crandon Street in Chicago. This court has previously recited the facts of this case, and we now recite those necessary to resolve this appeal.

¶ 5      Prior to trial, a hearing was held on defendant's motion to quash arrest, at which Detective Scott Rotkvich and Officer Paul Majors testified. The court denied the motion.

¶ 6      The case proceeded to a jury trial, at which the following evidence was presented.

¶ 7      Neoma Walker testified that between 3 p.m. and 3:30 p.m. on December 30, 1999, she was inside her home with her son, Thomas, who was asleep upstairs in a separate apartment unit. She lived in the bottom unit with her nephew, Carl Freeman. That day, a man, later identified as Lokomis "BeBe" Stephenson, arrived at her door with a bouquet of balloons. He pointed a gun at her and told her to open the door or he would shoot her. She then saw another man, who she identified at trial as defendant, walking down the street. A third, unidentified man ran onto the porch from the side of the house, also carrying a gun. The three men forced their way inside Neoma's house. While Stephenson held Neoma at gunpoint on the first floor, the unidentified man ran up the back stairwell to Thomas's apartment and defendant ran up the front stairwell. Defendant then came back down, grabbed Freeman, and went upstairs using Freeman "as a shield."

Stephenson bound Neoma's hands and placed duct tape over her mouth. She told Stephenson that he could have her money, and he responded that it was not about her but about her son. Stephenson punched Neoma in the mouth, knocking out one of her teeth, when she refused to stop talking. Neoma stated that she heard some "scuffling" upstairs and then multiple gunshots. Stephenson called to someone upstairs whose name started with an "S." Neoma tried to run but Stephenson punched her in the stomach and told her not to make him kill her. He refused to let her use the washroom and told her to "piss on herself." After the last gunshot, the two assailants upstairs came downstairs. All the phones were thrown in a closet, and all three men left. Freeman came downstairs and removed the tape from Neoma's face and hands. She located a phone and called the police. When she went upstairs, she found Thomas lying face down in a pool of blood. He later died of multiple gunshot wounds.

¶ 8    Neoma further testified that on January 17, 2000, detectives came to her house and showed her an array of photographs. From those, she identified Stephenson as the individual with the balloons. Later, on February 2, 2000, she went to the police station and viewed a lineup from which she identified Stephenson. On August 7, 2000, she again went to the police station where the detectives conducted a second lineup. From that lineup, she identified defendant.

¶ 9    Carl Freeman testified that there were three assailants and all of them had guns. He saw them put tape over Neoma's mouth and on her hands. Two of the men walked him upstairs by the collar, and he saw them "work Tommy over" and Thomas shot one of the men. He testified that they then held Thomas's hands back and shot him in the head.

¶ 10    Tiffany Harris testified that she lived with Thomas and their child at the time of his death. On that day, Harris left the apartment around 2 p.m. and Thomas was still in bed. When she left,

there was a gun on top of the VCR, which was no longer there afterwards. She stated that she had seen the gun for the first time a couple weeks prior.

¶ 11    Chicago police officer Paul Majors saw a daily bulletin regarding defendant and attempted to locate him, as he was familiar with defendant from his dealings in that neighborhood. He went to defendant's address "every couple of weeks" beginning in January but the door went unanswered. He later learned that defendant had gone to Florida in April 2000 because he knew that the police were looking for him. On August 7, 2000, Majors went back to defendant's address after learning that he had returned to Chicago. There, Majors told defendant that detectives wanted to speak with him, and defendant agreed to go to the police station with his girlfriend, Tangy Courtney.

¶ 12    Chicago police detective Scott Rotkvich investigated the home invasion at South Crandon. When he arrived at the residence, he spoke with Neoma and Freeman. He testified that he needed Neoma's assistance in understanding Freeman because he had a speech impediment and was mentally challenged. From his interview with Freeman and Neoma, he learned that the one of the assailants called another one by the name of "Sean." Detective Rotkvich went to the hospital, where he learned that Thomas died from his injuries. On January 17, 2000, while at Neoma's house, he met an individual named Davon Johnson, from whom he learned defendant's and Stephenson's names and their possible connection to the crimes.

¶ 13    Later that day, he showed Neoma a photo array, from which she immediately identified Stephenson as one of the assailants. A photo of defendant was also included in the photo array, however, Neoma did not identify him as one of the assailants. On February 1, 2000, Detective Rotkvich interviewed Stephenson at the police station. On the following day, he conducted a lineup

at the police station, at which Neoma again identified Stephenson. Detective Rotkvich made numerous attempts to locate defendant, but he could not be found.

¶ 14    On August 7, 2000, Detective Rotkvich was informed that defendant had been located and was being taken to the police station. That day, he interviewed defendant. After defendant was advised of his *Miranda* rights, he told the detective that he wanted to clear his name. He stated that on the day of Thomas's murder, he was with his friend, Aaron Richardson, and they went to the house of another friend, Larry Courtney, for the entire day. Defendant recalled hearing gunshots that afternoon and he learned about Thomas's murder the following week. He also stated that he was not aware that the police were looking for him. After the interview, Detective Rotkvich conducted another lineup which, this time, included defendant whom Neoma recognized as one of the assailants.[1] He spoke with defendant once again, this time with Assistant State's Attorney Beth Pfeiffer present. Defendant was informed that he was identified as one of the individuals involved in the home invasion and murder. Defendant again insisted that he was with Richardson that day. On August 8, 2000, Detective Rotkvich spoke with Richardson. On cross-examination, he confirmed that he did not speak with defendant's mother or aunt.

¶ 15    Richardson testified that in December 1999 he had an infection that kept him at home for several days at the end of the month. Specifically, on December 30, 1999, Richardson was at his sister's house and did not see defendant that day. On February 1, 2000, he was in a car with defendant when they saw police outside of defendant's house. Defendant directed Richardson to drive him to a friend's house instead. When they arrived at the friend's house, there were also

---

[1]Though Detective Rotkvich testified at the hearing on the motion to quash arrest that Freeman observed this lineup and did not identify defendant as one of the assailants, no testimony to this effect was presented at trial from either Detective Rotkvich or Freeman.

police there and defendant became "paranoid" and "scared." Later, at another friend's house, defendant was informed that the police were looking for him. Richardson did not see defendant again until April 2000 when defendant told him that he would be going to Florida for some time to avoid the police.

¶ 16    Detective David Fidyk testified that at about 11 p.m. on August 8, 2000, he and Pfeiffer advised defendant of his *Miranda* rights and took his statement. At first, defendant again claimed that he was with Richardson on the day of Thomas's murder. However, after being informed that the police were unable to verify his alibi, defendant told Detective Fidyk that he wanted to be honest. Defendant knew that a couple of weeks prior to the murder, Stephenson lost a gun to Thomas while Stephenson was attempting to rob Thomas. Stephenson and another individual, Chad, asked defendant if he would help them recover the gun from Thomas and defendant refused.

¶ 17    After the State rested, the defense made a motion for a directed finding, which the court denied.

¶ 18    Debra Mills, defendant's mother, testified that in December 1999, she was not staying at her own house because it was undergoing repairs because of a fire. Instead, she was living at her mother's house during that time and defendant was staying at Yolanda Brown's house. Brown acted as a "surrogate aunt" to defendant as she and Mills were very close friends. On December 29, 1999, Mills went to Brown's house and she stayed there until January 1. On December 30, she stayed at the house all day with defendant watching movies and eating junk food. Defendant and Mills did not leave the house that day, but Brown came and went a couple times. Defendant's girlfriend, Tangy Courtney, also visited at some point.

¶ 19    Mills further testified that defendant went to Florida on vacation in April 2000 and returned to Chicago in August 2000. Mills stated that the police did not contact her about defendant prior to him leaving for Florida.

¶ 20    The jury found defendant guilty of first-degree murder and home invasion. The court then sentenced him to 45 years' imprisonment for the murder and 20 years' imprisonment for the home invasion, to be served concurrently.

¶ 21    On direct appeal, defendant argued that the trial court improperly denied his motion to quash arrest, the trial court prevented him from litigating the issue of his unlawful detention, and the prosecutor improperly bolstered the credibility of a witness during closing argument. This court rejected his arguments and affirmed his convictions. See *People v. Mills*, 355 Ill. App. 3d 1186 (2005) (unpublished order under Supreme Court Rule 23).

¶ 22    On August 4, 2005, defendant filed a *pro se* postconviction petition raising 21 arguments. On November 1, 2005, the trial court summarily dismissed the petition. Defendant appealed two of his claims of ineffective assistance of counsel, and this court affirmed the trial court's dismissal. *People v. Mills*, 327 Ill. App. 3d 1097 (2007) (unpublished order under Supreme Court Rule 23).

¶ 23    On January 10, 2008, defendant filed his first successive postconviction petition, arguing (1) actual innocence based on Yolanda Brown's affidavit; (2) denial of his right to confront witnesses; (3) ineffective assistance of counsel; and (4) denial of his right to present a defense. On February 29, 2008, the trial court denied defendant's request to file the petition. On June 13, 2008, this court denied defendant's motion for leave to file a late notice of appeal.

¶ 24    On December 9, 2008, defendant filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2006)), requesting that the trial

court vacate his conviction. The trial court dismissed the 2-1401 petition as frivolous and without merit.

¶ 25 On May 26, 2015, defendant, proceeding *pro se*, filed a motion for leave to file a second successive postconviction petition, which is the subject of this appeal. In this petition, defendant claims actual innocence based on the affidavits of Jacob Ellzey and Everett Taylor, which are attached to his petition. Defendant argues that Ellzey's affidavit shows that Kenja Hawthorne was one of the offenders and that Hawthorne specifically told Ellzey that defendant was not involved in the murder and home invasion. Defendant further claims that Ellzey's affidavit is corroborated by Taylor's affidavit, where Taylor avers that he saw Hawthorne exiting Walker's home on the day in question. As to Taylor's affidavit, defendant argues that it clearly establishes that he was not, in fact, one of the offenders.

¶ 26 In his affidavit, Ellzey averred the following. He did not personally witness Thomas's murder, but he did have a conversation with Hawthorne, his "best friend," who claimed that he killed Thomas. Prior to the confession, Ellzey was aware that Hawthorne and Thomas had argued about the amount of money owed for an exchange of cocaine. After this confrontation, Hawthorne told Ellzey that he was going to get his money back and kill Thomas. In late December 1999, Hawthorne came to Ellzey's house with a gun in his hand and repeatedly said "I got that b***!" Hawthorne told Ellzey that he took "Lil Homie" to Thomas's house, killed Thomas, and "got his money back." Ellzey averred that he did not know who "Lil Homie" was. Ellzey told Hawthorne to leave, and he did not see him again for four or five months. Around August 2000, Ellzey heard rumors that defendant had been arrested for Thomas's murder. In September 2000, after defendant's arrest, Ellzey was with Hawthorne who laughed upon learning that defendant was

arrested for the murder when defendant was not with him on the day of the offense. Ellzey stated that he knew defendant from the neighborhood, along with Thomas.

¶ 27    Ellzey further averred that he was never contacted regarding Thomas's murder.  He did not reveal what Hawthorne had told them because they were "best friends", and he was conflicted. Finally, he stated that he decided to come forward with this information now because he recently saw a news story about an individual who served 20 years in prison for a crime he did not commit. He now wants to help defendant, who he believes has been wrongfully convicted of Thomas's murder. Ellzey also stated that he would testify under oath to the information contained in the affidavit.

¶ 28    In his affidavit, Taylor averred the following. In the afternoon of December 1999, he was walking near Thomas's house when he saw Kenja Hawthorne running "from between two houses towards the street and yelling to someone to hurry up." He saw another man run out of the door of one of the houses and observed that they were both carrying handguns. He did not know who the second man was, but he had seen him around the neighborhood and "would be able to identify him[.]" He decided not to approach Hawthorne at this time due to the presence of the guns. The next day he was in the passenger seat of a car with his friend, June, who informed Taylor that her friend, "T.C." (Thomas's nickname), had been killed in his house the day before. "Without asking, [June] pointed out her friend T.C.'s house as she drove past it" and this house was the one that Taylor had seen the man run out of the day before. He believed at that moment that Hawthorne and the other man were likely involved in the murder, but he did not mention it because he did not want "word to spread" that he saw Hawthorne because Hawthorne had a "reputation for violence, and it was rumored that "he'd killed a lot of people." Taylor averred that he was recently reminded of Thomas's death and he told his friend Jo-Jo what he saw that day. Jo-Jo told Taylor that she

knew the individuals who were convicted of Thomas's murder and she showed him a picture of defendant. He told her that defendant was not the person he saw running away with Hawthorne. He then took it upon himself to contact defendant to inform him of this information to assist in proving his innocence. Finally, he averred that he provided the affidavit voluntarily and he is willing to testify to the information contained in the affidavit.

¶ 29     On November 17, 2016, the trial court denied defendant's request for leave to file his second successive petition. The court found that defendant's claim of actual innocence was meritless because Ellzey did not have any personal knowledge of the crimes and his affidavit was "rebutted by overwhelming evidence of [defendant's] guilt." The court further found that Taylor also did not have personal knowledge of the crimes and his affidavit was not inconsistent with the evidence presented at trial.

¶ 30     This appeal followed.

¶ 31                                   II. ANALYSIS

¶ 32     The issue before us is whether the trial court erred in denying defendant leave to file his second successive postconviction petition. Defendant argues that he was entitled to file his petition because he established a colorable claim of actual innocence, based on the affidavits of Ellzey and Taylor. He further contends that the evidence from their affidavits would be reasonably likely to change the outcome upon retrial.

¶ 33     The Act provides a method for a defendant to collaterally attack a conviction by asserting it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/122-1(a) (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Generally, criminal defendants are entitled to file only one postconviction petition under the Act, which further specifies that any claims not raised in the original or amended petition are waived. 725 ILCS 5/122-3 (West 2016); *People v. Holman*,

191 Ill. 2d 204, 210 (2000). However, as relevant here, our supreme court has found that a criminal defendant may file a successive postconviction petition if necessary, to prevent a fundamental miscarriage of justice. *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009). "To demonstrate such a miscarriage of justice, a petitioner must show actual innocence[.]" *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). In order to file such a successive postconviction petition, a defendant must first obtain "leave of court." 725 ILCS 5/122-1(f) (West 2016).

¶ 34    The standard for filing a successive petition "falls between the first-stage pleading requirement for an initial petition and the second-stage requirement of a substantial showing." *People v. Robinson*, 2020 IL 123849, ¶ 58. A request for leave to file should only be denied "where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Id.* ¶ 44. A colorable claim means that "the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.* At this stage, all well-pleaded allegations that are not positively rebutted by the record must be taken as true and the court is precluded from making factual and credibility determinations. *Id.* ¶ 45. We review *de novo* the denial of a motion for leave to file a successive postconviction petition. *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 74.

¶ 35    To establish a claim of actual innocence, a defendant must show that the evidence in support of his or her claim is newly discovered, material and not merely cumulative, and of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)).

¶ 36    Here, the State concedes that the affidavits are newly discovered, not cumulative, and material, and we agree. First, the affidavits are new as the affiants' knowledge of the crime would

not have been known to defendant earlier and both affiants stated that they were initially afraid to come forward with this information. Second, the information in the affidavits is not cumulative as the jury was not presented with evidence of Hawthorne's involvement and his statement that defendant was not one of the assailants. See *Ortiz*, 235 Ill. 2d at 335 (stating that evidence is "cumulative when it adds nothing to what was already before the jury"). Finally, the affidavits are material because the information contained within them go to a central issue before the jury, namely whether defendant was present and participated in the home invasion and murder of Thomas. *People v. Smith*, 2015 IL App (1st) 140494, ¶ 20 (finding that evidence was material where it went to who was the shooter).

¶ 37    Instead, the State argues solely that the affidavits are not of such conclusive character that it is more likely than not that no reasonable juror would find defendant guilty beyond a reasonable doubt. Specifically, the State contends that Taylor's affidavit is insufficient because his account of seeing two individuals fleeing Neoma's house was inconsistent with the trial evidence that there were three offenders. The State also argues that Ellzey's affidavit containing information that Hawthorne committed the murder does not negate defendant's guilt where there were three assailants.

¶ 38    The conclusive character of the new evidence is the most important element of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47 (citing *Washington*, 171 Ill. 2d at 489). As to this element, we must determine "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). The new evidence need not be "entirely dispositive," as "[p]robability, rather than certainty, is the key in considering whether the fact

finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 39    Initially, we recognize that Ellzey's proposed testimony is hearsay. Though the trial court based its denial in part upon the hearsay nature of the affidavit, the State has not argued that the affidavit should not be considered because it is hearsay, likely because our supreme court issued *Robinson* in the interim. Under *Robinson*, the fact that an affidavit contains hearsay that would be inadmissible at retrial does not render it legally insufficient for postconviction proceedings, where the rules of evidence do not apply. 2020 IL 123849, ¶ 78; Illinois Rules of Evidence 1101(b)(3) (eff. Sept. 1, 2019). Moreover, arguments addressing the admissibility of an extrajudicial confession under *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973), are premature at this stage of postconviction proceedings. *Id.* ¶ 81. Thus, the fact that Ellzey's affidavit contains hearsay serves as no impediment to further review of defendant's claims.

¶ 40    Defendant argues that evidence that Hawthorne committed the murder is of such conclusive character that it would change the result of a retrial. He invites our attention to *People v. Warren*, 2016 IL App (1st) 090884-C, as instructive. The State argues that *Warren* is inapposite and, therefore, provides no support for defendant's argument.

¶ 41    At issue in *Warren*, as here, was the defendant's actual innocence claim set forth in his successive postconviction petition, to which he attached four affidavits to support his claim. 2016 IL App (1st) 090884-C, ¶ 32. The defendant in *Warren* was convicted of first-degree murder related to a shooting. *Id.* ¶ 1. At the defendant's trial, the State presented eyewitnesses who identified the defendant as the shooter from "less than ideal circumstances" where they had to take cover from "a hail of gunfire." The defendant presented evidence that he was not at the scene of the shooting and that Willie Madlock was actually the shooter. *Id.* ¶¶ 17, 85. Similar to the case

before us, the supporting affidavits provided evidence that another individual, Madlock, confessed to the murder and specifically stated that the defendant was not the shooter. *Id.* ¶¶ 34-37. The affidavits also contained evidence that an individual who was present at the murder (but was not the shooter), Germaine Bledsoe, knew Madlock was the shooter, and that the defendant was not present. *Id.* As to the conclusiveness element of actual innocence claims, the court held that the affidavits, taken as true, would likely result in a different outcome upon retrial. *Id.* ¶ 84. In so holding, the court stated that the affidavits supported the defendant's trial theory that he was not involved and that Madlock was the shooter <u>and further, that</u> the affidavits provided substantial evidence that the actual shooter confessed to the murder. *Id.* ¶ 141.

¶ 42 Significantly, *Warren* was decided by this court prior to the issuance of *Robinson*, wherein our supreme court clarified the standard for actual innocence claims and, in particular, held that hearsay statements in affidavits did not affect the analysis at the first stage. Much of the *Warren* opinion is devoted to explaining why the hearsay statements are acceptable at this stage and addressing the *Chambers*' hearsay exception. *Id.* ¶¶ 88-104. The *Warren* court also <u>appears</u> to have assessed the strength of the State's case, which we have now been instructed by the supreme court, in no uncertain terms, to refrain from doing. Accordingly, to some extent, the import of *Warren* has been diminished by the advent of *Robinson*.

¶ 43 Nonetheless, the State contends that *Warren* is distinguishable because defendant here did not present a defense at trial that Hawthorne was the actual shooter and because the affidavits only show Hawthorne confessing once whereas in *Warren,* Madlock confessed multiple times. These factual distinctions, however, do not persuade us that a result different from the one reached in *Warren* should yield here. We reject out of hand even a suggestion that multiple confessions of the actual shooter are required to advance an actual innocence claim to second-stage proceedings.

Further, although defendant's theory at trial did not include the identification of the actual shooter, he maintained his innocence throughout the investigation and at trial.

¶ 44     After reviewing the record along with defendant's supporting affidavits, which we must take as true, we find that defendant has presented evidence that could undermine confidence in the judgment of guilt. Ellzey's affidavit contains evidence that Hawthorne confessed to murdering Thomas and stated that defendant was not involved in the murder. Taylor, who as far as this court can tell, is not associated with Ellzey, nonetheless partially corroborates the information contained in Ellzey's affidavit. On the day in question, Taylor observed Hawthorne and another man running out of Neoma's house. These affidavits, then, provide potential evidence that defendant was not involved in the home invasion and murder and at least calls into question Neoma's eyewitness identification of defendant.

¶ 45     Additionally, the record does not positively rebut the information contained in the affidavits. To be positively rebutted, it must be "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. Here, no physical or forensic evidence linked defendant to the crimes. The only evidence specifically linking defendant to the crimes was an eyewitness identification from Neoma eight months after the crimes occurred, an identification that she could not make from a photo array a couple weeks after the incident. There was no evidence presented at trial indicating that Freeman, who was upstairs during the shooting, and who was also present with Neoma at the August 7, 2000 lineup, identified defendant as one of the three assailants. Though the evidence in the affidavits that Hawthorne was involved in the murder and defendant was not contradicts Neoma's eyewitness identification, it is not impossible that a fact finder could find that Hawthorne was involved instead of defendant and

Neoma's identification was incorrect. Moreover, Taylor's claim that he only saw two men leaving Neoma's house is not fatal to defendant's claim of actual innocence. It is also entirely possible that one of the three men left earlier or went a different way such that Taylor did not see him—hence, the reason defendant's petition should continue for further proceedings. Thus, the evidence contained in the affidavits is not positively rebutted by the trial record, and "[w]ithout engaging in any credibility determinations, there is no way for this court—or any court—to assess the reliability of those affidavits or the veracity of their assertions." *Id.* ¶ 83. We therefore conclude that a fact finder could determine that the new evidence exculpates defendant from involvement in the crimes.

¶ 46    Accordingly, we find that defendant has satisfied the pleading requirement for obtaining leave to file a successive postconviction petition and his claim of actual innocence must be advanced to second-stage proceedings under the Act. See *id.* ¶ 85 ("[T]he only issue presented in this case is whether [the defendant] may file his successive postconviction petition that alleges he is actually innocent of the crimes for which he has been convicted and sentenced.").

¶ 47                                III. CONCLUSION

¶ 48    For the reasons stated, we reverse the judgment of the circuit court and remand for further proceedings.

¶ 49    Reversed and remanded.